[Civ. No. 23154. Second Dist., Div. One. Oct. 20, 1958.]

Estate of CANFIELD WILSON, Deceased. AUDREY L. COTTERMAN, Appellant, v. LOLA REYNOLDS, Respondent.

Emmett E. Patten and Glen A. Duke for Appellant.

Youngdahl & Glick and Norman W. Alschuler for Respondent.

FOURT, J.—This is an appeal by Audrey L. Cotterman, a niece of the deceased Canfield Wilson, from a judgment awarding letters of administration to Lola Reynolds, the legitimated natural daughter of the deceased.

In this case there was a three-way contest for letters of administration. Fern Forister claimed to be the common law wife of the decedent under a purported common law marriage in Nevada, and as such entitled to letters in his estate. Lola Reynolds, the daughter of Fern Forister, claimed to be the legitimated natural daughter of the decedent, and as such entitled to letters in his estate. Appellant, Audrey L. Cotterman, claimed letters as the daughter of a deceased brother of the deceased.

The sole question at issue is whether the facts support a finding that Lola Reynolds was adopted and legitimated, pursuant to the provisions of section 230 of the Civil Code. That section reads as follows:

"The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth. The foregoing provisions of this chapter do not apply to such an adoption." (Enacted 1872.)

It is not contended, on this appeal, that Lola Reynolds was not the daughter of decedent. There was, without question, sufficient evidence to warrant such a finding.

The decedent, during his lifetime, was at one time a bartender. He was married to Marjory Yuill on March 11, 1931, and they separated in 1935, and a final decree of divorce was entered between them on August 24, 1938. He was married to Jean Kellner on September 13, 1939, which marriage was terminated by a final divorce on March 29, 1948. Fern Forister met the decedent about December 10, 1932, and they stayed together for about two weeks, and during such period of time Lola Reynolds was conceived. The decedent's wife at that time, Marjory, testified, in substance, that decedent was away from home for the two weeks in question and that he had admitted to the fact that he had associated with Fern. The wife also testified that sometime in February or March of 1933, the decedent admitted to her that he was in trouble with Fern, who was then pregnant. The wife further stated that she and the deceased gave Fern money from time to time,

and that after the birth of the child it was in their home on occasions; that on one of such occasions the baby remained from about noon to dusk, slept on the couch and was played with by the decedent and his mother. An almost identical episode occurred about one year later. Further, the wife stated that on one of such occasions, ''we discussed the situation in a friendly manner . . . we discussed the resemblance, and he said, 'She looks like me.' And I said, 'Yes, you can't deny her.' He said, 'I'm not denying her.' That was in front of her mother.'' Further, she stated that the father had done such natural things as fondling the child and holding her in his arms and playing with her. The wife also stated that every time they saw the child, ''We discussed ——the resemblance was so clear. . . .'' The paternal grandmother played with the child in the presence of the deceased and on occasions when there were no customers at the bar where the deceased was employed, he would place the child upon the bar and play and talk with her, and would state, ''This is my little girl.'' Further the wife testified that throughout her marriage to the deceased they gave Fern money, from time to time, to support and maintain the child, and that they visited at Fern's home to see the child, and that all of this was with her consent as the wife of the deceased.

The decedent and his wife separated in 1935, and he went to Nevada. Fern took the child, Lola, with her to Nevada and they lived with the deceased at Henderson, Nevada, during the summer vacation period of 1936.

The decedent remained in Nevada. However, he occasionally visited his mother and stepfather, the Ainsworths, in Los Angeles County until the death of Mr. Ainsworth in 1955, at which time he returned to Los Angeles County to care for his mother, Mrs. Ainsworth.

When Lola was about 12 years of age she was brought, at the request of her grandmother Ainsworth, to the grandmother's home. A witness described the visitation by stating that the deceased was there and that he greeted the child by putting his arms around her and inquiring about how she was getting along, which pleased the grandmother. The deceased would say, ''How is my Lola?''

During the funerals of both of the Ainsworths, Lola sat in the family room reserved solely for the nearest of kin, and rode to the graveside in the family car. When the services were completed the deceased introduced Lola, his daughter, to friends present whom she had not met theretofore.

Further, when Lola was about 17 years of age she wanted to get married and told her mother about it. The mother advised her that she would have to secure the consent of her father. The mother Fern, Lola, and Lola's intended husband, Peter Reynolds, then drove to Nevada to talk with the deceased. At first the deceased stated that Lola was too young to get married, but later changed his mind, and when told that the wedding would cost about $100, he gave Lola this amount and wished her well. Lola was married on April 1, 1950.

There was sufficient evidence, if believed by the trial court, for it to find that the decedent publicly acknowledged that Lola was his natural child, that the decedent took Lola into his family with the consent of his wife and that he otherwise treated her as if she were a legitimate child. Based upon such a finding, the court properly found that Lola was the legitimated surviving daughter of Canfield Wilson, deceased, and as such entitled to have letters of administration issued to her.

In *Blythe* v. *Ayres*, 96 Cal. 532, referring to section 230 of the Civil Code, it is said (at p. 576 [31 P. 915, 19 L.R.A. 40]):

"This section of the code is entitled to a liberal construction, because section 4 provides: 'The rule of the common law, that statutes in derogation thereof are to be strictly construed, has no application to this code. The code establishes the law of this state respecting the subjects to which it relates, and its provisions . . . are to be liberally construed, with a view to effect its objects and to promote justice.' "

*Estate of Lund*, 26 Cal.2d 472, at page 481 [159 P.2d 643, 162 A.L.R. 606], states, "It cannot be seriously disputed that the public policy of California disavows the common-law tenets and favors legitimation."

Also, the court in the Lund case said (at page 482): "The last quoted statute [Civ. Code, § 230] is that upon which petitioner relies. It is, on its face, primarily a law governing legitimation or status but if under it the petitioner has attained the status of legitimacy 'for all purposes' in California then he is entitled to the benefit of the general succession statutes."

In the Blythe case, *supra*, referring to the use of the word "acknowledge" in the section under consideration, it is stated (at p. 577): "The word 'acknowledge' has no technical meaning, and in its ordinary acceptation is defined, by Web-

ster, 'to own or admit the knowledge of.' It is not necessary to dwell at great length upon this special element necessary to satisfy the statute. Under the evidence, it can hardly be considered debatable. Blythe declared the plaintiff to be his child, to all persons, upon all occasions. He was garrulous upon the subject. . . . He acknowledged the child to its mother and to its grandmother before it was born, and subsequently, in no single instance, was he ever heard to deny its paternity.''

Certainly, the evidence in the present case discloses that the decedent declared the child Lola to be his. He acknowledged to his wife that he was the father of a child to be born to Fern, and introduced the child many times as his own, and years later, at the funeral of his mother, he further introduced the child as his. These are but a few of the circumstances which appear very convincing to us.

It is true that the decedent did not have much of a family life as we know such generally, but in the first instance, when the child was born, and the visitations were made to the decedent's home, the child was received with the consent of the then wife into decedent's family. Under the circumstances of this particular case, we believe that the child was received into decedent's family as such with the consent of his wife.

Passing to the remaining element of the statute which requires the father's "otherwise treating it as if it were a legitimate child." In this case there can be no doubt that the decedent did otherwise treat Lola as though she were his legitimate child. As the court stated in *Blythe* v. *Ayres*, *supra*, at pages 580-581: "If the father had publicly acknowledged the child to be his child, and has taken it into his family, it would seem but little remained to be done to wash away forever the stain of bastardy. The public acknowledgment of the child is the main fact. It is the important factor, in the eyes of the statute. If the child was publicly acknowledged and received into the family, it would be a novel case where a court of equity would close its doors and refuse to declare a legitimation because the child was poorly clothed and illy fed. The case has not yet arisen, and it is hoped and believed it never will. The statute clearly means that the father must treat his illegitimate child as he would naturally treat his legitimate child, not as the majority of men in his financial circumstances would or should treat their children. Every man furnishes the rule by which he must be measured. No imaginary standard of excellence can be created, and then

it be demanded that Blythe shall rise to that standard. If appellants' contention be true, a child whose father was an ignorant man believing education an evil to be shunned, and who therefore denied an education to the child, could not be granted legitimation. . . . . It appears that at no time was she deprived of the necessaries of life. She resided at all times either with her mother or her grandfather. Blythe furnished something near $150 a year for her support; certainly during her infancy this was entirely sufficient, and no complaints were made to him that more money was needed to meet her wants. At all these times he himself was either stopping in a log house in the mountains of Trinity, or living with his mistress in lodgings in San Francisco, surrounded by his dogs, birds, and cats, while his hens were located upon the roof. It may well be inferred from the simplicity of his own life as indicated by the foregoing circumstances, that if legitimate children had been born to him, they would have been treated, as far as pecuniary expenditures were concerned, upon the same lines as this illegitimate child was treated.''

It was appropriately stated in *Estate of Lund, supra,* at pages 494-496: ''Likewise it must be accepted as true that once a child has been received into the family of its father, *it attains the de facto status of a member of that family,* and unless disavowed, such status . (in a broad sense) continues with it for the remainder of its days. The word 'family' means not merely those who live in one house but, in equally wide usage, signifies all who are descended from a not too distant common progenitor. (Webster's New Int. Dict. (2d ed.)) Here the petitioner was received into the intimate family circle, the household itself; . . . . It is not shown to have ever been disavowed or terminated. . . .

''It is presumed 'That a thing once proved to exist continues as long as is usual with things of that nature' (Code Civ. Proc., § 1963, subd. 32) and 'That a person is innocent of . . . wrong' (Code Civ. Proc., § 1963, subd. 1). . . . Once the child has been unconditionally received into the family, he was received permanently and continuingly unless and until such reception was revoked (if in its nature it could be revoked), and a revocation of such reception would constitute an unnatural and wrong act. Such an act will not be presumed. . . .

''. . . The biological relationship of father and son, and the de facto family relationship which the father had established, are not transient or volatile things which may exist

one moment and be nonexistent the next, or which depend for their continuance upon repetitions of the original words or acts. Once proclaimed and established they exist as facts for all time and in all places.''

The judgment is affirmed.

White, P. J., and Lillie, J., concurred.