108 Cal.Rptr.2d 165 (2001)
25 Cal.4th 904
24 P.3d 1191
ESTATE of Denis H. GRISWOLD, Deceased.
Norma B. Doner-Griswold, Petitioner and Respondent,
v.
Francis V. See, Objector and Appellant.
No. S087881.
Supreme Court of California.
June 21, 2001.
*167 Kitchen & Turpin, David C. Turpin, Santa Barbara, Law Office of Herb Fox and Herb Fox, Santa Barbara, for Objector and Appellant.
Mullen & Henzell and Lawrence T. Sorensen, Santa Barbara, for Petitioner and Respondent.
*166 BAXTER, J.
Section 6452 of the Probate Code (all statutory references are to this code unless otherwise indicated) bars a "natural parent" or a relative of that parent from inheriting through a child born out of wedlock on the basis of the parent and child relationship unless the parent or relative "acknowledged the child" and "contributed to the support or the care of the child." In this case, we must determine whether section 6452 precludes the half siblings of a child born out of wedlock from sharing in the child's intestate estate where the record is undisputed that their father appeared in an Ohio court, admitted paternity of the child, and paid court-ordered child support until the child was 18 years old. Although the father and the out-of-wedlock child apparently never met or communicated, and the half siblings did not learn of the child's existence until after both the child and the father died, there is no indication that the father ever denied paternity or knowledge of the out-of-wedlock child to persons who were aware of the circumstances.
Since succession to estates is purely a matter of statutory regulation, our resolution of this issue requires that we ascertain the intent of the lawmakers who enacted section 6452. Application of settled principles of statutory construction compels us to conclude, on this uncontroverted record, that section 6452 does not bar the half siblings from sharing in the decedent's estate.

Factual and Procedural Background
Denis H. Griswold died intestate in 1996, survived by his wife, Norma B. Doner-Griswold. Doner-Griswold petitioned for and received letters of administration and authority to administer Griswold's modest estate, consisting entirely of separate property.
In 1998, Doner-Griswold filed a petition for final distribution, proposing a distribution of estate property, after payment of attorney's fees and costs, to herself as the surviving spouse and sole heir. Francis V. See, a self-described "forensic genealogist" (heir hunter) who had obtained an assignment of partial interest in the Griswold estate from Margaret Loera and Daniel Draves,[1] objected to the petition for final distribution and filed a petition to determine entitlement to distribution.
See and Doner-Griswold stipulated to the following background facts pertinent to See's entitlement petition.
Griswold was born out of wedlock to Betty Jane Morris on July 12, 1941 in Ashland, Ohio. The birth certificate listed his name as Denis Howard Morris and identified John Edward Draves of New London, Ohio as the father. A week after the birth, Morris filed a "bastardy complaint"[2] *168 in the juvenile court in Huron County, Ohio and swore under oath that Draves was the child's father. In September of 1941, Draves appeared in the bastardy proceeding and "confessed in Court that the charge of the plaintiff herein is true." The court adjudged Draves to be the "reputed father" of the child, and ordered Draves to pay medical expenses related to Morris's pregnancy as well as $5 per week for child support and maintenance. Draves complied, and for 18 years paid the court-ordered support to the clerk of the Huron County court.
Morris married Fred Griswold in 1942 and moved to California. She began to refer to her son as "Denis Howard Griswold," a name he used for the rest of his life. For many years, Griswold believed Fred Griswold was his father. At some point in time, either after his mother and Fred Griswold divorced in 1978 or after his mother died in 1983, Griswold learned that Draves was listed as his father on his birth certificate. So far as is known, Griswold made no attempt to contact Draves or other members of the Draves family.
Meanwhile, at some point after Griswold's birth, Draves married in Ohio and had two children, Margaret and Daniel. Neither Draves nor these two children had any communication with Griswold, and the children did not know of Griswold's existence until after Griswold's death in 1996. Draves died in 1993. His last will and testament, dated July 22, 1991, made no mention of Griswold by name or other reference. Huron County probate documents identified Draves's surviving spouse and two childrenMargaret and Daniel as the only heirs.
Based upon the foregoing facts, the probate court denied See's petition to determine entitlement. In the court's view, See had not demonstrated that Draves was Griswold's "natural parent" or that Draves "acknowledged" Griswold as his child as required by section 6452.
The Court of Appeal disagreed on both points and reversed the order of the probate court. We granted Doner-Griswold's petition for review.

Discussion
Denis H. Griswold died without a will, and his estate consists solely of separate property. Consequently, the intestacy rules codified at sections 6401 and 6402 are implicated. Section 6401, subdivision (c) provides that a surviving spouse's share of intestate separate property is one-half "[w]here the decedent leaves no issue but leaves a parent or parents or their issue or the issue of either of them." (§ 6401, subd. (c)(2)(B).) Section 6402, subdivision (c) provides that the portion of the intestate estate not passing to the surviving spouse under section 6401 passes as follows: "If there is no surviving issue or parent, to the issue of the parents or either of them, the issue taking equally if they are all of the same degree of kinship to the decedent...."
As noted, Griswold's mother (Betty Jane Morris) and father (John Draves) both predeceased him. Morris had no issue other than Griswold and Griswold himself left no issue. Based on these facts, See contends that Doner-Griswold is entitled to one-half of Griswold's estate and that Draves's issue (See's assignors, Margaret and Daniel) are entitled to the other half pursuant to sections 6401 and 6402.
*169 Because Griswold was born out of wedlock, three additional Probate Code provisionssection 6450, section 6452, and section 6453must be considered.
As relevant here, section 6450 provides that "a relationship of parent and child exists for the purpose of determining intestate succession by, through, or from a person" where "[t]he relationship of parent and child exists between a person and the person's natural parents, regardless of the marital status of the natural parents." (Id., subd. (a).)
Notwithstanding section 6450's general recognition of a parent and child relationship in cases of unmarried natural parents, section 6452 restricts the ability of such parents and their relatives to inherit from a child as follows: "If a child is born out of wedlock, neither a natural parent nor a relative of that parent inherits from or through the child on the basis of the parent and child relationship between that parent and the child unless both of the following requirements are satisfied: [¶] (a) The parent or a relative of the parent acknowledged the child, [¶] (b) The parent or a relative of the parent contributed to the support or the care of the child." (Italics added.)
Section 6453, in turn, articulates the criteria for determining whether a person is a "natural parent" within the meaning of sections 6450 and 6452. A more detailed discussion of section 6453 appears post, at part B.
It is undisputed here that section 6452 governs the determination whether Margaret, Daniel, and See (by assignment) are entitled to inherit from Griswold. It is also uncontroverted that Draves contributed court-ordered child support for 18 years, thus satisfying subdivision (b) of section 6452. At issue, however, is whether the record establishes all the remaining requirements of section 6452 as a matter of law. First, did Draves acknowledge Griswold within the meaning of section 6452, subdivision (a)? Second, did the Ohio judgment of reputed paternity establish Draves as the natural parent of Griswold within the contemplation of sections 6452 and 6453? We address these issues in order.

A. Acknowledgement
As indicated, section 6452 precludes a natural parent or a relative of that parent from inheriting through a child born out of wedlock unless the parent or relative "acknowledged the child." (Id., subd. (a).) On review, we must determine whether Draves acknowledged Griswold within the contemplation of the statute by confessing to paternity in court, where the record reflects no other acts of acknowledgement, but no disavowals either.
In statutory construction cases, our fundamental task is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. (Day v. City of Fontanea (2001) 25 Cal.4th 268, 272, 105 Cal.Rptr.2d 457, P.3d 1196.) "We begin by examining the statutory language, giving the words their usual and ordinary meaning." (Ibid.; People v. Lawrence (2000) 24 Cal.4th 219, 230, 99 Cal.Rptr.2d 570, 6 P.3d 228.) If the terms of the statute are unambiguous, we presume the lawmakers meant what they said, and the plain meaning of the language governs. (Day v. City of Fontana, supra, 25 Cal.4th at p. 272, 105 Cal.Rptr.2d 457, 19 P.3d 1196; People v. Lawrence, supra, 24 Cal.4th at pp. 230-231, 99 Cal.Rptr.2d 570, 6 P.3d 228.) If there is ambiguity, however, we may then look to extrinsic sources, including the ostensible objects to be achieved and the legislative history. (Day v. City of Fontana, supra, 25 Cal.4th at p. 272, 105 Cal.Rptr.2d 457, 19 P.3d *170 1196.) In such cases, we "`"select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences."'" (Ibid.)
Section 6452 does not define the word "acknowledged." Nor does any other provision of the Probate Code. At the outset, however, we may logically infer that the word refers to conduct other than that described in subdivision (b) of section 6452, i.e., contributing to the child's support or care; otherwise, subdivision (a) of the statute would be surplusage and unnecessary.
Although no statutory definition appears, the common meaning of "acknowledge" is "to admit to be true or as stated; confess." (Webster's New World Diet. (2d ed.1982) p. 12; see Webster's 3d New Internal Diet. (1981) p. 17 ["to show by word or act that one has knowledge of and agrees to (a fact or truth) ... [or] concede to be real or true ... [or] admit"].) Were we to ascribe this common meaning to the statutory language, there could be no doubt that section 6452's acknowledgement requirement is met here. As the stipulated record reflects, Griswold's natural mother initiated a bastardy proceeding in the Ohio juvenile court in 1941 in which she alleged that Draves was the child's father. Draves appeared in that proceeding and publicly "confessed" that the allegation was true. There is no evidence indicating that Draves did not confess knowingly and voluntarily, or that he later denied paternity or knowledge of Griswold to those who were aware of the circumstances.[3] Although the record establishes that Draves did not speak of Griswold to Margaret and Daniel, there is no evidence suggesting he sought to actively conceal the facts from them or anyone else. Under the plain terms of section 6452, the only sustainable conclusion on this record is that Draves acknowledged Griswold.
Although the facts here do not appear to raise any ambiguity or uncertainty as to the statute's application, we shall, in an abundance of caution, test our conclusion against the general purpose and legislative history of the statute. (See Day v. City of Fontana, supra, 25 Cal.4th at p. 274, 105 Cal.Rptr.2d 457, 19 P.3d 1196; Powers v. City of Richmond (1995) 10 Cal.4th 85, 93, 40 Cal.Rptr.2d 839, 893 P.2d 1160.)
The legislative bill proposing enactment of former section 6408.5 of the Probate Code (Stats.1983, ch. 842, § 55, p. 3084; Stats.1984, ch. 892, § 42, p. 3001), the first modern statutory forerunner to section 6452, was introduced to effectuate the Tentative Recommendation Relating to Wills and Intestate Succession of the California Law Revision Commission (the Commission). (See 17 Cal. Law Revision Com. Rep. (1984) p. 867, referring to 16 Cal. Law Revision Com. Rep. (1982) p. 2301.) According to the Commission, which had been solicited by the Legislature to study and recommend changes to the then existing Probate Code, the proposed comprehensive legislative package to govern wills, intestate succession, and related matters would "provide rules that are more likely to carry out the intent of the testator or, if a person dies without a will, the intent a decedent without a will is most likely to have had." (16 Cal. Law Revision Com. Rep., supra, at p. 2319.) The Commission also advised that the purpose of the legislation was to "make probate more efficient and expeditious." (Ibid.) From all that *171 appears, the Legislature shared the Commission's views in enacting the legislative bill of which former section 6408.5 was a part. (See 17 Cal. Law Revision Com. Rep., supra, at p. 867.)
Typically, disputes regarding parental acknowledgement of a child born out of wedlock involve factual assertions that are made by persons who are likely to have direct financial interests in the child's estate and that relate to events occurring long before the child's death. Questions of credibility must be resolved without the child in court to corroborate or rebut the claims of those purporting to have witnessed the parent's statements or conduct concerning the child. Recognition that an in-court admission of the parent and child relationship constitutes powerful evidence of an acknowledgement under section 6452 would tend to reduce litigation over such matters and thereby effectuate the legislative objective to "make probate more efficient and expeditious." (16 Cal. Law Revision Com. Rep., supra, at p. 2319.)
Additionally, construing the acknowledgement requirement to be met in circumstances such as these is neither illogical nor absurd with respect to the intent of an intestate decedent. Put another way, where a parent willingly acknowledged paternity in an action initiated to establish the parent-child relationship and thereafter was never heard to deny such relationship (§ 6452, subd. (a)), and where that parent paid all court-ordered support for that child for 18 years (id., subd. (b)), it cannot be said that the participation of that parent or his relative in the estate of the deceased child is either (1) so illogical that it cannot represent the intent that one without a will is most likely to have had (16 Cal. Law Revision Com. Rep., supra, at p. 2319) or (2) "so absurd as to make it manifest that it could not have been intended" by the Legislature (Estate of De Cigaran (1907) 150 Cal. 682, 688, 89 P. 833 [construing Civ.Code, former § 1388 as entitling the illegitimate half sister of an illegitimate decedent to inherit her entire intestate separate property to the exclusion of the decedent's surviving husband]).
There is a dearth of case law pertaining to section 6452 or its predecessor statutes, but what little there is supports the foregoing construction. Notably, Lozano v. Scalier (1996) 51 Cal.App.4th 843, 59 Cal. Rptr.2d 346 (Lozano), the only prior decision directly addressing section 6452's acknowledgement requirement, declined to read the statute as necessitating more than what its plain terms call for.
In Lozano, the issue was whether the trial court erred in allowing the plaintiff, who was the natural father of a 10-month-old child, to pursue a wrongful death action arising out of the child's accidental death. The wrongful death statute provided that where the decedent left no spouse or child, such an action may be brought by the persons "who would be entitled to the property of the decedent by intestate succession." (Code Civ. Proc., § 377.60, subd. (a).) Because the child had been born out of wedlock, the plaintiff had no right to succeed to the estate unless he had both "acknowledged the child" and "contributed to the support or the care of the child" as required by section 6452. Lozano upheld the trial court's finding of acknowledgement in light of evidence in the record that the plaintiff had signed as "Father" on a medical form five months before the child's birth and had repeatedly told family members and others that he was the child's father. (Lozano, supra, 51 Cal.App.4th at pp. 845, 848, 59 Cal.Rptr.2d 346.)
Significantly, Lozano rejected arguments that an acknowledgement under Probate Code section 6452 must be (1) a witnessed writing and (2) made after the child was born so that the child is identified. *172 In doing so, Lozano initially noted there were no such requirements on the face of the statute. (Lozano, supra, 51 Cal.App.4th at p. 848, 59 Cal.Rptr.2d 346.) Lozano next looked to the history of the statute and made two observations in declining to read such terms into the statutory language. First, even though the Legislature had previously required a witnessed writing in cases where an illegitimate child sought to inherit from the father's estate, it repealed such requirement in 1975 in an apparent effort to ease the evidentiary proof of the parent-child relationship. (Ibid.) Second, other statutes that required a parent-child relationship expressly contained more formal acknowledgement requirements for the assertion of certain other rights or privileges. (See id. at p. 849, 59 Cal.Rptr.2d 346, citing Code Civ. Proc., § 376, subd. (c), Health & Safety Code, § 102750, & Fam. Code, § 7574.) Had the Legislature wanted to impose more stringent requirements for an acknowledgement under section 6452, Lozano reasoned, it certainly had precedent for doing so. (Lozano, supra, 51 Cal.App.4th at p. 849, 59 Cal.Rptr.2d 346.)
Apart from Probate Code section 6452, the Legislature had previously imposed an acknowledgement requirement in the context of a statute providing that a father could legitimate a child born out of wedlock for all purposes "by publicly acknowledging it as his own." (See Civ.Code, former § 230.)[4] Since that statute dealt with an analogous subject and employed a substantially similar phrase, we address the case law construing that legislation below.
In Blythe v. Ayres (1892) 96 Cal. 532, 31 P. 915, decided over a century ago, this court determined that the word "acknowledge," as it appeared in former section 230 of the Civil Code, had no technical meaning. (Blythe v. Ayres, supra, 96 Cal. at p. 577, 31 P. 915.) We therefore employed the word's common meaning, which was "`to own or admit the knowledge of" (Ibid, [relying upon Webster's definition]; see also Estate of Gird (1910) 157 Cal. 534, 542, 108 P. 499.) Not only did that definition endure in case law addressing legitimation (Estate of Wilson (1958) 164 Cal. App.2d 385, 388-389, 330 P.2d 452; see Estate of Gird, supra, 157 Cal. at pp. 542-543, 108 P. 499), but, as discussed, the word retains virtually the same meaning in general usage today"to admit to be true or as stated; confess." (Webster's New World Diet., supra, at p. 12; see Webster's 3d New Internal Diet., supra, at p. 17.)
Notably, the decisions construing former section 230 of the Civil Code indicate that its public acknowledgement requirement would have been met where a father made a single confession in court to the paternity of a child.
In Estate of McNamara (1919) 181 Cal. 82, 183 P. 552, for example, we were emphatic in recognizing that a single unequivocal act could satisfy the acknowledgement requirement for purposes of statutory legitimation. Although the record in that case *173 had contained additional evidence of the father's acknowledgement, we focused our attention on his one act of signing the birth certificate and proclaimed: "A more public acknowledgement than the act of [the decedent] in signing the child's birth certificate describing himself as the father, it would be difficult to imagine." (Id. at pp. 97-98,183 P. 552.)
Similarly, in Estate of Gird supra, 157 Cal. 534, 108 P. 499, we indicated in dictum that "a public avowal, made in the courts" would constitute a public acknowledgement under former section 230 of the Civil Code. (Estate of Gird, supra, 157 Cal. at pp. 542-543,108 P. 499.)
Finally, in Wong v. Young (1947) 80 Cal.App.2d 391, 181 P.2d 741, a man's admission of paternity in a verified pleading, made in an action seeking to have the man declared the father of the child and for child support, was found to have satisfied the public acknowledgement requirement of the legitimation statute. (Id. at pp. 393-394, 181 P.2d 741.) Such admission was also deemed to constitute an acknowledgement under former Probate Code section 255, which had allowed illegitimate children to inherit from their fathers under an acknowledgement requirement that was even more stringent than that contained in Probate Code section 6452.[5] (Wong v. Young, supra, 80 Cal.App.2d at p. 394, 181 P.2d 741; see also Estate of De Laveaga (1904) 142 Cal. 158, 168, 75 P. 790 [indicating in dictum that, under a predecessor to Probate Code section 255, father sufficiently acknowledged an illegitimate child in a single witnessed writing declaring the child as his son].) Ultimately, however, legitimation of the child under former section 230 of the Civil Code was not found because two other of the statute's express requirements, i.e., receipt of the child into the father's family and the father's otherwise treating the child as his legitimate child (see ante, fn. 4), had not been established. (Wong v. Young, supra, 80 Cal. App.2d at p. 394, 181 P.2d 741.)
Although the foregoing authorities did not involve section 6452, their views on parental acknowledgement of out-of-wedlock children were part of the legal landscape when the first modern statutory forerunner to that provision was enacted in 1985. (See former § 6408.5, added by Stats.1983, ch. 842, § 55, p. 3084, and amended by Stats.1984, ch. 892, § 42, p. 3001.) Where, as here, legislation has been judicially construed and a subsequent statute on the same or an analogous subject uses identical or substantially similar language, we may presume that the Legislature intended the same construction, unless a contrary intent clearly appears. (In re Jerry R. (1994) 29 Cal.App.4th 1432, 1437, 35 Cal.Rptr.2d 155; see also People v. Masbruch (1996) 13 Cal.4th 1001, 1007, 55 Cal.Rptr.2d 760, 920 P.2d 705; Belridge Farms v. Agricultural Labor Relations Bd. (1978) 21 Cal.3d 551, 557, 147 Cal. Rptr. 165, 580 P.2d 665.) Since no evidence of a contrary intent clearly appears, we may reasonably infer that the types of acknowledgement formerly deemed sufficient for the legitimation statute (and former section 255, as well) suffice for purposes of intestate succession under section 6452.[6]
*174 Doner-Griswold disputes whether the acknowledgement required by Probate Code section 6452 may be met by a father's single act of acknowledging a child in court. In her view, the requirement contemplates a situation where the father establishes an ongoing parental relationship with the child or otherwise acknowledges the child's existence to his subsequent wife and children. To support this contention, she relies on three other authorities addressing acknowledgement under former section 230 of the Civil Code: Blythe v. Ayres, supra, 96 Cal. 532, 31 P. 915, Estate of Wilson, supra, 164 Cal. App.2d 385, 330 P.2d 452, and Estate of Maxey (1967) 257 Cal.App.2d 391, 64 Cal. Rptr. 837.
In Blythe v. Ayres, supra, 96 Cal. 532, 31 P. 915, the father never saw his illegitimate child because she resided in another country with her mother. Nevertheless, he "was garrulous upon the subject" of his paternity and "it was his common topic of conversation." (Id. at p. 577, 31 P. 915.) Not only did the father declare the child to be his child, "to all persons, upon all occasions," but at his request the child was named and baptized with his surname. (Ibid.) Based on the foregoing, this court remarked that "it could almost be held that he shouted it from the house-tops." (Ibid.) Accordingly, we concluded that the father's public acknowledgement under former section 230 of the Civil Code could "hardly be considered debatable." (Blythe v. Ayres, supra, 96 Cal. at p. 577, 31 P. 915.)
In Estate of Wilson, supra, 164 Cal. App.2d 385, 330 P.2d 452, the evidence showed that the father had acknowledged to his wife that he was the father of a child born to another woman. (Id. at p. 389, 330 P.2d 452.) Moreover, he had introduced the child as his own on many occasions, including at the funeral of his mother. (Ibid.) In light of such evidence, the Court of Appeal upheld the trial court's finding that the father had publicly acknowledged the child within the contemplation of the legitimation statute.
In Estate of Maxey, supra, 257 Cal. App.2d 391, 64 Cal.Rptr. 837, the Court of Appeal found ample evidence supporting the trial court's determination that the father publicly acknowledged his illegitimate son for purposes of legitimation. The father had, on several occasions, visited the house where the child lived with his mother and asked about the child's school attendance and general welfare. (Id. at p. 397, 64 Cal.Rptr. 837.) The father also, in the presence of others, had asked for permission to take the child to his own home for the summer, and, when that request was refused, said that the child was his son and that he should have the child part of the time. (Ibid.) In addition, the father had addressed the child as his son in the presence of other persons. (Ibid)
Doner-Griswold correctly points out that the foregoing decisions illustrate the principle that the existence of acknowledgement must be decided on the circumstances of each case. (Estate of Baird (1924) 193 Cal. 225, 277, 223 P. 974.) In those decisions, however, the respective fathers had not confessed to paternity in a legal action. Consequently, the courts *175 looked to what other forms of public acknowledgement had been demonstrated by fathers. (See also Lozano, supra, 51 Cal. App.4th 843, 59 Cal.Rptr.2d 346 [examining father's acts both before and after child's birth in ascertaining acknowledgement under § 6452].)
That those decisions recognized the validity of different forms of acknowledgement should not detract from the weightiness of a father's in-court acknowledgement of a child in an action seeking to establish the existence of a parent and child relationship. (See Estate of Gird, supra, 157 Cal. at pp. 542-543, 108 P. 499; Wong v. Young, supra, 80 Cal.App.2d at pp. 393-394, 181 P.2d 741.) As aptly noted by the Court of Appeal below, such an acknowledgement is a critical one that typically leads to a paternity judgment and a legally enforceable obligation of support. Accordingly, such acknowledgements carry as much, if not greater, significance than those made to certain select persons (Estate of Maxey, supra, 257 Cal.App.2d at p. 397, 64 Cal.Rptr. 837) or "shouted ... from the house-tops" (Blythe v. Ayres, supra, 96 Cal. at p. 577, 31 P. 915).
Doner-Griswold's authorities do not persuade us that section 6452 should be read to require that a father have personal contact with his out-of-wedlock child, that he make purchases for the child, that he receive the child into his home and other family, or that he treat the child as he does his other children. First and foremost, the language of section 6452 does not support such requirements. (See Lozano, supra, 51 Cal.App.4th at p. 848, 59 Cal.Rptr.2d 346.) We may not, under the guise of interpretation, insert qualifying provisions not included in the statute. (California Fed. Savings & Loan Assn. v. City of Los Angeles (1995) 11 Cal.4th 342, 349, 45 Cal.Rptr.2d 279, 902 P.2d 297.)
Second, even though Blythe v. Ayres, supra, 96 Cal. 532, 31 P. 915, Estate of Wilson, supra, 164 Cal.App.2d 385, 330 P.2d 452, and Estate of Maxey, supra, 257 Cal.App.2d 391, 64 Cal.Rptr. 837, variously found such factors significant for purposes of legitimation, their reasoning appeared to flow directly from the express terms of the controlling statute. In contrast to Probate Code section 6452, former section 230 of the Civil Code provided that the legitimation of a child born out of wedlock was dependent upon three distinct conditions: (1) that the father of the child "publicly acknowledg[e] it as his own"; (2) that he "receiv[e] it as such, with the consent of his wife, if he is married, into his family"; and (3) that he "otherwise treat[ ] it as if it were a legitimate child." (Ante, fn. 4; see Estate of De Laveaga, supra, 142 Cal. at pp. 168-169, 75 P. 790 [indicating that although father acknowledged his illegitimate son in a single witnessed writing, legitimation statute was not satisfied because the father never received the child into his family and did not treat the child as if he were legitimate].) That the legitimation statute contained such explicit requirements, while section 6452 requires only a natural parent's acknowledgement of the child and contribution toward the child's support or care, strongly suggests that the Legislature did not intend for the latter provision to mirror the former in all the particulars identified by Doner-Griswold. (See Lozano, supra, 51 Cal.App.4th at pp. 848-849, 59 Cal.Rptr.2d 346; compare with Fam.Code, § 7611, subd. (d) [a man is "presumed" to be the natural father of a child if "[h]e receives the child into his home and openly holds out the child as his natural child"].)
In an attempt to negate the significance of Draves's in-court confession of paternity, Doner-Griswold emphasizes the circumstance that Draves did not tell his two *176 other children of Griswold's existence. The record here, however, stands in sharp contrast to the primary authority she offers on this point. Estate of Baird, supra, 193 Cal. 225, 223 P. 974, held there was no public acknowledgement under former section 230 of the Civil Code where the decedent admitted paternity of a child to the child's mother and their mutual acquaintances but actively concealed the child's existence and his relationship to the child's mother from his own mother and sister, with whom he had intimate and affectionate relations. In that case, the decedent not only failed to tell his relatives, family friends, and business associates of the child (193 Cal. at p. 252, 223 P. 974), but he affirmatively denied paternity to a half brother and to the family coachman (id. at p. 277, 223 P. 974). In addition, the decedent and the child's mother masqueraded under a fictitious name they assumed and gave to the child in order to keep the decedent's mother and siblings in ignorance of the relationship. (Id. at pp. 260-261, 223 P. 974.) In finding that a public acknowledgement had not been established on such facts, Estate of Baird stated: "A distinction will be recognized between a mere failure to disclose or publicly acknowledge paternity and a willful misrepresentation in regard to it; in such circumstances there must be no purposeful concealment of the fact of paternity." (Id. at p. 276, 223 P. 974.)
Unlike the situation in Estate of Baird, Draves confessed to paternity in a formal legal proceeding. There is no evidence that Draves thereafter disclaimed his relationship to Griswold to people aware of the circumstances (see ante, fn. 3), or that he affirmatively denied he was Griswold's father despite his confession of paternity in the Ohio court proceeding. Nor is there any suggestion that Draves engaged in contrivances to prevent the discovery of Griswold's existence. In light of the obvious dissimilarities, Doner-Griswold's reliance on Estate of Baird is misplaced.
Estate of Ginochio, supra, 43 Cal.App.3d 412, 117 Cal.Rptr. 565, likewise, is inapposite. That case held that a judicial determination of paternity following a vigorously contested hearing did not establish an acknowledgement sufficient to allow an illegitimate child to inherit under section 255 of the former Probate Code. (See ante, fn. 5.) Although the court noted that the decedent ultimately paid the child support ordered by the court, it emphasized the circumstance that the decedent was declared the child's father against his will and at no time did he admit he was the father, or sign any writing acknowledging publicly or privately such fact, or otherwise have contact with the child. (Estate of Ginochio, supra, 43 Cal.App.3d at pp. 416-417, 117 Cal.Rptr. 565.) Here, by contrast, Draves did not contest paternity, vigorously or otherwise. Instead, Draves stood before the court and openly admitted the parent and child relationship, and the record discloses no evidence that he subsequently disavowed such admission to anyone with knowledge of the circumstances. On this record, section 6452's acknowledgement requirement has been satisfied by a showing of what Draves did and did not do, not by the mere fact that paternity had been judicially declared.
Finally, Doner-Griswold contends that a 1996 amendment of section 6452 evinces the Legislature's unmistakable intent that a decedent's estate may not pass to siblings who had no contact with, or were totally unknown to, the decedent. As we shall explain, that contention proves too much.
Prior to 1996, section 6452 and a predecessor statute, former section 6408, expressly provided that their terms did not apply to "a natural brother or a sister of *177 the child" born out of wedlock.[7] In construing former section 6408, Estate of Corcoran (1992) 7 Cal.App.4th 1099, 9 Cal. Rptr.2d 475 held that a half sibling was a "natural brother or sister" within the meaning of such exception. That holding effectively allowed a half sibling and the issue of another half sibling to inherit from a decedent's estate where there had been no parental acknowledgement or support of the decedent as ordinarily required. In direct response to Estate of Corcoran, the Legislature amended section 6452 by eliminating the exception for natural siblings and their issue. (Stats.1996, ch. 862, § 15; see Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2751 (1995-1996 Reg. Sess.) as amended June 3, 1996, pp. 17-18 (Assembly Bill No. 2751).) According to legislative documents, the Commission had recommended deletion of the statutory exception because it "creates an undesirable risk that the estate of the deceased out-of-wedlock child will be claimed by siblings with whom the decedent had no contact during lifetime, and of whose existence the decedent was unaware." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 2751 (1995-1996 Reg. Sess.) as introduced Feb. 22, 1996, p. 6; see also Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2751, supra, at pp. 17-18.)
This legislative history does not compel Doner-Griswold's construction of section 6452. Reasonably read, the comments of the Commission merely indicate its concern over the "undesirable risk" that unknown siblings could rely on the statutory exception to make claims against estates. Neither the language nor the history of the statute, however, evinces a clear intent to make inheritance contingent upon the decedent's awareness of or contact with such relatives. (See Assem. Com. on Judiciary, Analysis of Assem. Bill No. 2751, supra, at p. 6; see also Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2751, supra, at pp. 17-18.) Indeed, had the Legislature intended to categorically preclude intestate succession by a natural parent or a relative of that parent who had no contact with or was unknown to the deceased child, it could easily have so stated. Instead, by deleting the statutory exception for natural siblings, thereby subjecting siblings to section 6452's dual requirements of acknowledgement and support, the Legislature acted to prevent sibling inheritance under the type of circumstances presented in Estate of Corcoran, supra, 7 Cal.App.4th 1099, 9 Cal. Rptr.2d 475, and to substantially reduce the risk noted by the Commission.[8]

*178 B. Requirement of a Natural Parent and Child Relationship
Section 6452 limits the ability of a "natural parent" or "a relative of that parent" to inherit from or through the child "on the basis of the parent and child relationship between that parent and the child."
Probate Code section 6453 restricts the means by which a relationship of a natural parent to a child may be established for purposes of intestate succession.[9] (See Estate of Sanders (1992) 2 Cal.App.4th 462, 474-475, 3 Cal.Rptr.2d 536.) Under section 6453, subdivision (a), a natural parent and child relationship is established where the relationship is presumed under the Uniform Parentage Act and not rebutted. (Fam.Code, § 7600 et seq.) It is undisputed, however, that none of those presumptions applies in this case.
Alternatively, and as relevant here, under Probate Code section 6453, subdivision (b), a natural parent and child relationship may be established pursuant to section 7630, subdivision (c) of the Family Code,[10] if a court order was entered during the father's lifetime declaring paternity.[11] (§ 6453, subd. (b)(1).)
See contends the question of Draves's paternity was fully and finally adjudicated in the 1941 bastardy proceeding in Ohio. That proceeding, he argues, satisfies both the Uniform Parentage Act and the Probate Code, and should be binding on the parties here.
If a valid judgment of paternity is rendered in Ohio, it generally is binding on California courts if Ohio had jurisdiction over the parties and the subject matter, and the parties were given reasonable notice and an opportunity to be heard. (Ruddock v. Ohls (1979) 91 Cal.App.3d 271, 276, 154 Cal.Rptr. 87.) California courts generally recognize the importance of a final determination of paternity. (E.g., *179 Weir v. Ferreira (1997) 59 Cal.App.4th 1509, 1520, 70 Cal.Rptr.2d 33 (Weir); Guardianship of Claralyn S. (1983) 148 Cal.App.3d 81, 85, 195 Cal.Rptr. 646; cf. Estate of Camp (1901) 131 Cal. 469, 471, 63 P. 736 [same for adoption determinations].)
Doner-Griswold does not dispute that the parties here are in privity with, or claim inheritance through, those who are bound by the bastardy judgment or are estopped from attacking it. (See Weir, supra, 59 Cal.App.4th at pp. 1516-1517, 1521, 70 Cal.Rptr.2d 33.) Instead, she contends See has not shown that the issue adjudicated in the Ohio bastardy proceeding is identical to the issue presented here, that is, whether Draves was the natural parent of Griswold.
Although we have found no California case directly on point, one Ohio decision has recognized that a bastardy judgment rendered in Ohio in 1950 was res judicata of any proceeding that might have been brought under the Uniform Parentage Act. (Birman v. Sproat (1988) 47 Ohio App.3d 65, 546 N.E.2d 1354, 1357 [child born out of wedlock had standing to bring will contest based upon a paternity determination in a bastardy proceeding brought during testator's life]; see also Black's Law Dict., supra, at pp. 146, 1148 [equating a bastardy proceeding with a paternity suit].) Yet another Ohio decision found that parentage proceedings, which had found a decedent to be the "reputed father" of a child,[12] satisfied an Ohio legitimation statute and conferred standing upon the illegitimate child to contest the decedent's will where the father-child relationship was established prior to the decedent's death. (Beck v. Jolliff (1984) 22 Ohio App.3d 84, 489 N.E.2d 825, 829; see also Estate of Hicks (1993) 90 Ohio App.3d 483, 629 N.E.2d 1086, 1088-1089 [parentage issue must be determined prior to the father's death to the extent the parent-child relationship is being established under the chapter governing descent and distribution].) While we are not bound to follow these Ohio authorities, they persuade us that the 1941 bastardy proceeding decided the identical issue presented here.
Next, Doner-Griswold argues the Ohio judgment should not be given res judicata effect because the bastardy proceeding was quasi-criminal in nature. It is her position that Draves's confession may have reflected only a decision to avoid a jury trial instead of an adjudication of the paternity issue on the merits.
To support this argument, Doner-Griswold relies upon Pease v. Pease (1988) 201 Cal.App.3d 29, 246 Cal.Rptr. 762 (Pease). In that case, a grandfather was sued by his grandchildren and others in a civil action alleging the grandfather's molestation of the grandchildren. When the grandfather cross-complained against his former wife for apportionment of fault, she filed a demurrer contending that the grandfather was collaterally estopped from asserting the negligent character of his acts by virtue of his guilty plea in a criminal proceeding involving the same issues. On appeal, the judgment dismissing the cross-complaint was reversed. The appellate court reasoned that a trial court in a civil proceeding may not give collateral estoppel effect to a criminal conviction involving the same issues if the conviction resulted from a guilty plea. "The issue of appellant's guilt was not fully litigated in the prior criminal proceeding; rather, appellant's plea bargain may reflect nothing more than a compromise instead of an ultimate determination of his guilt. Appellant's *180 due process right to a hearing thus outweighs any countervailing need to limit litigation or conserve judicial resources." (Id. at p. 34, 246 Cal.Rptr. 762, fn. omitted.)
Even assuming, for purposes of argument only, that Pease's reasoning may properly be invoked where the father's admission of paternity occurred in a bastardy proceeding (see Reams v. State ex rel. Favors (1936) 53 Ohio App. 19, 4 N.E.2d 151, 152 [indicating that a bastardy proceeding is more civil than criminal in character]), the circumstances here do not call for its application. Unlike the situation in Pease, neither the in-court admission nor the resulting paternity judgment at issue is being challenged by the father (Draves). Moreover, neither the father, nor those claiming a right to inherit through him, seek to litigate the paternity issue. Accordingly, the father's due process rights are not at issue and there is no need to determine whether such rights might outweigh any countervailing need to limit litigation or conserve judicial resources. (See Pease, supra, 201 Cal. App.3d at p. 34, 246 Cal.Rptr. 762.)
Additionally, the record fails to support any claim that Draves's confession merely reflected a compromise. Draves, of course, is no longer living and can offer no explanation as to why he admitted paternity in the bastardy proceeding. Although Doner-Griswold suggests that Draves confessed to avoid the publicity of a jury trial, and not because the paternity charge had merit, that suggestion is purely speculative and finds no evidentiary support in the record.
Finally, Doner-Griswold argues that See and Griswold's half siblings do not have standing to seek the requisite paternity determination pursuant to the Uniform Parentage Act under section 7630, subdivision (c) of the Family Code. The question here, however, is whether the judgment in the bastardy proceeding initiated by Griswold's mother forecloses Doner-Griswold's relitigation of the parentage issue.
Although Griswold's mother was not acting pursuant to the Uniform Parentage Act when she filed the bastardy complaint in 1941, neither that legislation nor the Probate Code provision should be construed to ignore the force and effect of the judgment she obtained. That Griswold's mother brought her action to determine paternity long before the adoption of the Uniform Parentage Act, and that all procedural requirements of an action under Family Code section 7630 may not have been followed, should not detract from its binding effect in this probate proceeding where the issue adjudicated was identical with the issue that would have been presented in a Uniform Parentage Act action. (See Weir, supra, 59 Cal. App.4th at p. 1521, 70 Cal.Rptr.2d 33.) Moreover, a prior adjudication of paternity does not compromise a state's interests in the accurate and efficient disposition of property at death. (See Trimble v. Gordon (1977) 430 U.S. 762, 772 & fn. 14, 97 S.Ct. 1459, 52 L.Ed.2d 31 [striking down a provision of a state probate act that precluded a category of illegitimate children from participating in their intestate fathers' estates where the parent-child relationship had been established in state court paternity actions prior to the fathers' deaths].)
In sum, we find that the 1941 Ohio judgment was a court order "entered during the father's lifetime declaring paternity" (§ 6453, subd. (b)(1)), and that it establishes Draves as the natural parent of Griswold for purposes of intestate succession under section 6452.

Disposition
"`Succession to estates is purely a matter of statutory regulation, which cannot *181 be changed by the courts.'" (Estate of De Cigaran, supra, 150 Cal. at p. 688, 89 P. 833.) We do not disagree that a natural parent who does no more than openly acknowledge a child in court and pay court-ordered child support may not reflect a particularly worthy predicate for inheritance by that parent's issue, but section 6452 provides in unmistakable language that it shall be so. While the Legislature remains free to reconsider the matter and may choose to change the rules of succession at any time, this court will not do so under the pretense of interpretation.
The judgment of the Court of Appeal is affirmed.
GEORGE, C.J., KENNARD, J., WERDEGAR, J., CHIN, J., concur.
Concurring Opinion by BROWN, J.
I reluctantly concur. The relevant case law strongly suggests that a father who admits paternity in court with no subsequent disclaimers "acknowledge] the child" within the meaning of subdivision (a) of Probate Code section 6452. Moreover, neither the statutory language nor the legislative history supports an alternative interpretation. Accordingly, we must affirm the judgment of the Court of Appeal.
Nonetheless, I believe our holding today contravenes the overarching purpose behind our laws of intestate successionto carry out "the intent a decedent without a will is most likely to have had." (16 Cal. Law Revision Com. Rep. (1982) p. 2319.) I doubt most children born out of wedlock would have wanted to bequeath a share of their estate to a "father" who never contacted them, never mentioned their existence to his family and friends, and only paid court-ordered child support. I doubt even more that these children would have wanted to bequeath a share of their estate to that father's other offspring. Finally, I have no doubt that most, if not all, children born out of wedlock would have balked at bequeathing a share of their estate to a "forensic genealogist."
To avoid such a dubious outcome in the future, I believe our laws of intestate succession should allow a parent to inherit from a child born out of wedlock only if the parent has some sort of parental connection to that child. For example, requiring a parent to treat a child born out of wedlock as the parent's own before the parent may inherit from that child would prevent today's outcome. (See, e.g., Bullock v. Thomas (Miss.1995) 659 So.2d 574, 577 [a father must "openly treat" a child born out of wedlock "as his own" in order to inherit from that child].) More importantly, such a requirement would comport with the stated purpose behind our laws of succession because that child likely would have wanted to give a share of his estate to a parent that treated him as the parent's own.
Of course, this court may not remedy this apparent defect in our intestate succession statutes. Only the Legislature may make the appropriate revisions. I urge it to do so here.
NOTES
[1] California permits heirs to assign their interests in an estate, but such assignments are subject to court scrutiny. (See § 11604.)
[2] A "bastardy proceeding" is an archaic term for a paternity suit. (Black's Law Diet. (7th ed.1999) pp. 146, 1148.)
[3] Huron County court documents indicate that at least two people other than Morris, one of whom appears to have been a relative of Draves, had knowledge of the bastardy proceeding.
[4] Former section 230 of the Civil Code provided: "The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth. The foregoing provisions of this Chapter do not apply to such an adoption." (Enacted 1 Cal. Civ.Code (1872) § 230, p. 68, repealed by Stats. 1975, ch. 1244, § 8, p. 3196.)

In 1975, the Legislature enacted California's Uniform Parentage Act, which abolished the concept of legitimacy and replaced it with the concept of parentage. (See Adoption of Kelsey S. (1992) 1 Cal.4th 816, 828-829, 4 Cal.Rptr.2d 615, 823 P.2d 1216.)
[5] Section 255 of the former Probate Code provided in pertinent part: "`Every illegitimate child, whether born or conceived but unborn, in the event of his subsequent birth, is an heir of his mother, and also of the person who, in writing, signed in the presence of a competent witness, acknowledges himself to be the father, and inherits his or her estate, in whole or in part, as the case may be, in the same manner as if he had been born in lawful wedlock. .. .'" (Estate of Ginochio (1974) 43 Cal.App.3d 412, 416, 117 Cal.Rptr. 565, italics omitted.)
[6] Probate Code section 6452's acknowledgement requirement differs from that found in former section 230 of the Civil Code, in that section 6452 does not require a parent to "publicly" acknowledge a child born out of wedlock. That difference, however, fails to accrue to Doner-Griswold's benefit. If anything, it suggests that the acknowledgement contemplated in section 6452 encompasses a broader spectrum of conduct than that associated with the legitimation statute.
[7] Former section 6408, subdivision (d) provided: "If a child is born out of wedlock, neither a parent nor a relative of a parent (except for the issue of the child or a natural brother or sister of the child or the issue of that brother or sister) inherits from or through the child on the basis of the relationship of parent and child between that parent and child unless both of the following requirements are satisfied: [¶] (1) The parent or a relative of the parent acknowledged the child. [¶] (2) The parent or a relative of the parent contributed to the support or the care of the child." (Stats.1990, ch. 79, § 14, p. 722, italics added.)
[8] We observe that, under certain former versions of Ohio law, a father's confession of paternity in an Ohio juvenile court proceeding was not the equivalent of a formal probate court "acknowledgement" that would have allowed an illegitimate child to inherit from the father in that state. (See Estate of Vaughan (2001) 90 Ohio St.3d 544, 740 N.E.2d 259, 262-263.) Here, however, Doner-Griswold does not dispute that the right of the succession claimants to succeed to Griswold's property is governed by the law of Griswold's domicile, i.e., California law, not the law of the claimants' domicile or the law of the place where Draves's acknowledgement occurred. (Civ.Code, §§ 755, 946; see Estate of Lund (1945) 26 Cal.2d 472, 493-496, 159 P.2d 643 [where father died domiciled in California, his out-of-wedlock son could inherit where all the legitimation requirements of former § 230 of the Civ. Code were met, even though the acts of legitimation occurred while the father and son were domiciled in two other states wherein such acts were not legally sufficient].)
[9] Section 6453 provides in full: "For the purpose of determining whether a person is a `natural parent' as that term is used is this chapter: [¶] (a) A natural parent and child relationship is established where that relationship is presumed and not rebutted pursuant to the Uniform Parentage Act, Part 3 (commencing with Section 7600) of Division 12 of the Family Code. [¶] (b) A natural parent and child relationship may be established pursuant to any other provisions of the Uniform Parentage Act, except that the relationship may not be established by an action under subdivision (c) of Section 7630 of the Family Code unless any of the following conditions exist: [¶] (1) A court order was entered during the father's lifetime declaring paternity. [¶] (2) Paternity is established by clear and convincing evidence that the father has openly held out the child as his own. [¶] (3) It was impossible for the father to hold out the child as his own and paternity is established by clear and convincing evidence."
[10] Family Code section 7630, subdivision (c) provides in pertinent part: "An action to determine the existence of the father and child relationship with respect to a child who has no presumed father under Section 7611 ... may be brought by the child or personal representative of the child, the Department of Child Support Services, the mother or the personal representative or a parent of the mother if the mother has died or is a minor, a man alleged or alleging himself to be the father, or the personal representative or a parent of the alleged father if the alleged father has died or is a minor. An action under this subdivision shall be consolidated with a proceeding pursuant to Section 7662 if a proceeding has been filed under Chapter 5 (commencing with Section 7660). The parental rights of the alleged natural father shall be determined as set forth in Section 7664."
[11] See makes no attempt to establish Draves's natural parent status under other provisions of section 6453, subdivision (b).
[12] The term "reputed father" appears to have reflected the language of the relevant Ohio statute at or about the time of the 1941 bastardy proceeding. (See State ex rel. Discus v. Van Dorn (1937) 56 Ohio App. 82, 10 N.E.2d 14, 16.)