Filed 5/2/17  Certified for publication 5/31/17 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CALIFORNIA TAXPAYERS ACTION NETWORK,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>TABER CONSTRUCTION, INC., et al.,<br><br>    Defendants and Respondents. | A145078<br><br>(Contra Costa County<br>Super. Ct. No. MSC1400996) |

Education Code section 17406 authorizes school districts to use lease-leaseback agreements in contracting for construction or improvement of school facilities.  Under a lease-leaseback agreement, the school district leases its own real property to a contractor for a nominal amount, and the contractor agrees to construct school facilities or improve existing facilities on the property and lease the property and improvements back to the school district.  At the end of the lease-leaseback agreement, title to the construction project vests in the school district.  (Ed. Code, § 17406, subd. (a); *Davis v. Fresno Unified School District* (2015) 237 Cal.App.4th 261, 277 (*Davis*).)

This case is the latest in a line of cases challenging the propriety of school districts' use of lease-leaseback agreements.  (See *Davis, supra*, 237 Cal.App.4th 261; *McGee v. Balfour Beatty Construction, LLC* (2016) 247 Cal.App.4th 235 (*McGee*); *Los Alamitos Unified School District v. Howard Contracting, Inc*. (2014) 229 Cal.App.4th 1222 (*Los Alamitos*).)  Plaintiff California Taxpayers Action Network brought a reverse validation action (Code Civ. Proc., § 863), raising various legal theories to challenge a

1

lease-leaseback agreement between defendants Mount Diablo Unified School District (the School District) and Taber Construction, Inc. (Taber). Defendants demurred, and the trial court sustained the demurrers without leave to amend.

We uphold the trial court's ruling on the demurrers as to all of the lease-leaseback related claims that attempt to engraft requirements on the transaction that are not part of the applicable Education Code. However, we conclude plaintiff has stated a claim of conflict of interest against Taber sufficient to withstand a demurrer.

Accordingly, we reverse the judgment with respect to plaintiff's fourth cause of action for conflict of interest and otherwise affirm.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

A "lease-leaseback" agreement under Education Code section 17406 has been described as a "method for financing and delivery of new school facilities." (*Davis*, *supra*, 237 Cal.App.4th at p. 276). It is an alternative to the traditional "design-bid-build" method, which involves hiring an architect to design the project, requesting competitive bids based on the design, and having the winning bidder build the project. (*Ibid.*)[2]

---

[1] We granted the applications of five organizations—Construction Employers Association, California Association of School Business Officials, California School Boards Association's Education Legal Alliance, Coalition for Adequate School Housing, and Association of California Construction Managers—to file briefs in support of defendant as amici curiae. We also granted plaintiff's request for judicial notice of documents filed on July 23, 2015, and we granted Taber's request for judicial notice of documents filed October 22, 2015.

[2] The Legislature first authorized lease-leaseback agreements in 1957. (*Davis*, *supra*, 237 Cal.App.4th at p. 276.) We note that a third project delivery method known as "design-build" was approved by the Legislature in 2001. (*Id*. at p. 279, fn. 10.) "Under the design-build delivery method, both the design and construction work is let to a single entity, which centralizes responsibility for both aspects of the project. ([Ed. Code,] § 17250.15, subd. (b) [definition of design-build]; see 10 Miller & Starr, Cal. Real Estate [(3d ed. 2010)] § 27:27, p. 27-143 [(rel. 9/2010)].) Design-build contracts are not subject to the competitive bidding requirements in Public Contract Code section 20110, but the school district must (1) invite competitive sealed proposals, (2) award the contract to the responsible bidder whose proposal is determined to provide the " 'best value' " to

2

In this case, the School District and construction firm Taber entered into a lease-leaseback agreement for Taber to complete a construction project, which involved heating, ventilation, and air conditioning (HVAC) modernization of five elementary schools and three middle schools owned by the School District. The agreement comprised a master site lease and a master facilities lease. Under the master site lease, the School District agreed to lease the "Project Sites," which are portions of the eight school sites, to Taber for one dollar. (This is the "lease" of the lease-leaseback agreement.) Under the master facilities lease, Taber agreed to construct the project for the "Guaranteed Project Cost" of $14,743,395. The master facilities lease included general construction provisions and construction schedules for each project site. The School District was to pay Taber $13,269,057 in "Tenant Improvement Payments" prior to "taking delivery or occupancy of the Project." Later, six "Lease Payment Amount[s]" of $245,723 plus interest would be paid at 30-day intervals starting 35 days after the filing of a notice of completion of the project. (This is the "leaseback" of the lease-leaseback agreement.)[3]

Plaintiff initiated a reverse validation action against Taber and the School District under California Code of Civil Procedure section 863.[4] In its first amended complaint

---

the school district, and (3) comply with the other requirements in [Education Code] section 17250.25. This selection method has been described as competitive selection." (*Ibid.*)

[3] Although the master site lease and master facilities lease were ostensibly separate contracts, the master site lease included a term that the project sites would be leased back to the School District pursuant to the master facilities lease, and the master facilities lease provided that it was executed at the same time as the master site lease. When we refer to "defendants' lease-leaseback agreement," we mean the master site lease and the master facilities lease together.

[4] Code of Civil Procedure section 863 is part of the validation statutes (Code Civ. Proc., §§ 860-870), which " 'provide an expedited process by which certain public agency actions may be determined valid and not subject to attack.' " [Citations.] The validation statutes apply to a matter when 'any other law' authorizes their application, and the statutes provide for a 60-day period during which an action may be brought to 'determine the validity of such matter.' (*Golden Gate Hill Development Company, Inc.*

3

(FAC), the operative pleading, plaintiff asserted seven causes of action: (1) failure to comply with Education Code sections 17400 et seq., (2) breach of fiduciary duty, (3) failure to comply with Education Code section 17417, (4) contractor conflict of interest, (5) improper use of Education Code sections 17400 et seq., (6) improper delegation of discretion, and (7) declaratory relief.

Plaintiff alleged, among other things, that the Education Code requires "genuine lease-leaseback agreements," which "provide for financing of the school facility project over time," but defendants' lease-leaseback contracts were "sham leases"; that the lease-leaseback contracts were illegal because a public bidding process is required for school construction projects; and that Taber was precluded from being awarded the contracts due to conflicts of interest that arose from Taber providing professional preconstruction services to the School District regarding the construction project prior to entering the lease-leaseback contracts.

The School District filed a demurrer to the FAC and a motion to strike portions of the FAC, and Taber filed a demurrer. The School District and Taber each requested the court take judicial notice of 57 documents, including a written opinion of the Attorney General from 1973, documents filed in pending cases raising the same issues (and brought by plaintiffs represented by Kevin Carlin, the attorney representing plaintiff in this case), Assembly Bill Number 1486 from 2004, and the Governor's veto message on the bill.[5]

---

*v. County of Alameda* (2015) 242 Cal.App.4th 760, 765-766.) "While [Code of Civil Procedure] section 860 authorizes a public agency to bring an action to validate matters to which the validation statutes apply, the public is also authorized to bring actions. Thus, section 863 provides that if the relevant public agency does not initiate validation proceedings, 'any interested person may bring an action within the time and in the court specified by Section 860 to determine the validity of such matter.' " (*Id*. at p. 766.)

[5] Among the documents listed in the defendants' requests for judicial notice were many default validation judgments involving various California school districts dating back to 2001. These were apparently intended to show that lease-leaseback construction agreements are commonly used by school districts throughout the state.

4

The trial court issued a tentative decision on the demurrers and the School District's motion to strike, no party requested argument, and the tentative decision became the court's final ruling. The trial court sustained defendants' demurrers without leave to amend.[6] It granted defendants' request for judicial notice of the published opinion of the California Attorney General but denied their requests as to the remaining 56 documents.

## DISCUSSION

### A.  *Standard of Review*

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

Issues of statutory construction are questions of law subject to independent review. (*MacIsaac v. Waste Management Collection and Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082. (*MacIsaac*).)

---

[6] The trial court found the School District's motion to strike moot in light of the ruling on the School District's demurrer.

**B.** *First, Third, and Fifth Causes of Action: Claims Based on the Education Code*

Education Code sections 17400 through 17429 (article 2) govern leases and agreements relating to real property and buildings used by school districts.[7]  Plaintiff's first, third, and fifth causes of action are expressly premised on the allegation that the lease-leaseback agreement in this case (consisting of the master site lease and the master facilities lease) does not comply with article 2 and, in particular, sections 17406 and 17417.  As will be seen, section 17417 imposes competitive bidding requirements for school construction projects, but section 17406 exempts lease-leaseback agreements from the requirements of section 17417.  Plaintiff contends defendants' lease-leaseback agreement is not a genuine lease-leaseback agreement under section 17406, and, therefore, defendants' agreement is illegal because the School District did not comply with section 17417 and obtain competitive bids.  In addition, plaintiff contends that, as a matter of statutory interpretation, section 17406 does *not* exempt school districts from the competitive bidding requirements of section 17417.  We conclude plaintiff has failed to state any claim based on asserted violation of article 2.

  1.  *Relevant Education Code Statutes*

Section 17417 generally requires competitive bidding for school construction projects and sets forth the procedures for soliciting and reviewing sealed bids.[8]  Section

---

  [7] Further undesignated statutory references are to the Education Code.  Because sections 17400 through 17429 are at title 1, division 1, part 10.5, chapter 4, article 2 of the Education Code, we refer to this set of statutes as "article 2."

  [8] Section 17417 provides:  "After the governing board of a school district has complied with Section 17402, it shall, in a regular open meeting, adopt a resolution declaring its intention to enter into a lease or agreement pursuant to this article.  The resolution shall describe, in any manner to identify it, the available site upon which the building to be used by the district shall be constructed, shall generally describe the building to be constructed and state that the building shall be constructed pursuant to the plans and specifications adopted by the governing board therefor, shall, if that is the case, state the minimum yearly rental at which the governing board will lease real property belonging to the district upon which the building is to be constructed, and shall state the maximum number of years for which the school district will lease the building or site and building, as the case may be, and shall state that the proposals submitted therefor shall

17406 offers an exception to section 17417. The version of section 17406, subdivision (a), in effect in 2014 provides: "Notwithstanding Section 17417, the governing board of a school district, without advertising for bids, may let, for a minimum rental of one dollar ($1) a year, to any person, firm, or corporation any real property that belongs to the district if the instrument by which such property is let requires the lessee therein to construct on the demised premises, or provide for the construction thereon of, a building or buildings for the use of the school district during the term thereof, and provides that title to that building shall vest in the school district at the expiration of that term. The instrument may provide for the means or methods by which that title shall vest in the school district prior to the expiration of that term, and shall contain such other terms and conditions as the governing board may deem to be in the best interest of the school district." (Former § 17406, subd. (a), added by Stats.1996, ch. 277, § 3.)[9]

---

designate the amount of rental, which shall be annual, semiannual, or monthly, to be paid by the school district for the use of the building, or building and site, as the case may be. The resolution shall fix a time, not less than three weeks thereafter for a public meeting of the governing board to be held at its regular place of meeting, at which sealed proposals to enter a lease or agreement with the school district will be received from any person, firm, or corporation, and considered by the governing board. Notice thereof shall be given in the manner provided in Section 17469."

"At the time and place fixed in the resolution for the meeting of the governing body, all sealed proposals which have been received shall, in public session, be opened, examined, and declared by the board. Of the proposals submitted which conform to all terms and conditions specified in the resolution of intention to enter a lease or agreement and which are made by responsible bidders, the proposal which calls for the lowest rental shall be finally accepted, or the board shall reject all bids. The board is not required to accept a proposal, or else reject all bids, on the same day as that in which the proposals are opened."

Section 17402 requires the governing board of a school district to "have available a site upon which a building to be used by the district may be constructed" and to prepare and adopt "plans and specifications for the building . . . approved pursuant to Sections 17280 to 17316 [governing the construction of school buildings]" before it may enter into a lease.

[9] Section 17406 has since been amended, as we discuss *post* at footnote 18. The parties do not dispute that the version of section 17406 in effect in 2014 applies to

2.      *First Cause of Action: Defendants' Lease-Leaseback Agreement Meets the Requirements of Section 17406*

Plaintiff contends it has properly alleged a violation of section 17406 because, even though defendants' lease-leaseback agreement meets the express requirements of section 17406, the agreement is a sham and subterfuge to avoid the competitive bidding requirements of section 17417.  We disagree.

Our conclusion is based on the plain language of section 17406.  The statute has three requirements: "[1] the real property belong[s] to the school district, [2] the lease is for the purposes of construction, and [3] the title shall vest in the school district at the end of the lease term."  (*McGee*, *supra*, 247 Cal.App.4th at p. 244; § 17406, subd. (a)(1).)[10] Here, the lease-leaseback agreement between the School District and Taber, as alleged by plaintiff, meets these three statutory requirements.  The School District owns the project sites, the agreement requires Taber to complete the construction project (HVAC modernization), and title vests in the School District at the end of the lease term.  Nothing more is required.[11]

Plaintiff premises its contention that section 17406 imposes additional requirements on *City of Los Angeles v. Offner* (1942) 19 Cal.2d 483 (*Offner*), but the case

---

determining the requirements of a lease-leaseback agreement.  Further references to section 17406 are to the 2014 version of the statute unless otherwise specified.

[10] *Los Alamitos*, *supra*, 229 Cal.App.4th 1222 also recognized three requirements for a lease-leaseback agreement under section 17406.  The court determined the school district established the necessary elements of its validation action where the district showed "[1] it owns the land to be leased; [2] Byrom-Davey, the contractor for the Project, agreed to construct the Project for a guaranteed maximum price; and [3] title to the site and all improvements made by the Project will vest in the District at the end of the lease term."  (*Id.* at p. 1227.)

[11] We note that Taber identifies *four* requirements under section 17406: (1) the school district owns the property, (2) *the school district lets the property to the contractor for a minimum rent*, (3) the agreement requires the contractor to provide construction services, and (4) title to the improvements vests with the school district at the expiration of the lease term.  The lease-leaseback agreement in this case meets the minimum lease requirement.

8

has nothing to do with section 17406 and is inapposite. In *Offner*, the city of Los Angeles proposed a lease-leaseback agreement under which the city would lease its real property to a contractor, the contractor would build a rubbish incinerator on the property, and the contractor would lease the property with the incinerator back to the city for 10 years. (*Id.* at p. 484.) The city's proposed lease-leaseback agreement was challenged "on the ground that [the proposed agreement] would violate the constitutional provision [former article 11, section 18 of the California Constitution] which prohibits a city from incurring an indebtedness or liability in any year in excess of the income and revenue provided for that year without the assent of two-thirds of the qualified electors of the city." (*Id.* at p. 485.)

In *Offner*, the California Supreme Court framed the question for consideration as "whether the city in entering into the proposed leases and contract will incur an indebtedness or liability for the rentals for the entire term or whether such action will create an indebtedness or liability in that year for such rentals only as will become payable during that fiscal year." (*Offner*, *supra*, 19 Cal.2d at p. 485.) The court observed that the general rule from case law is "no violence is done to the constitutional provision" "if the lease or other agreement is entered into in good faith and creates no immediate indebtedness for the aggregate installments therein provided for but, on the contrary, confines liability to each installment as it falls due and each year's payment is for the consideration actually furnished that year." (*Id.* at p. 486.) On the other hand, if "the instrument creates a full and complete liability upon its execution, or if its designation as a 'lease' is a subterfuge and it is actually a conditional sales contract in which the 'rentals' are installment payments on the purchase price for the aggregate of which an immediate and present indebtedness or liability exceeding the constitutional limitation arises against the public entity, the contract is void." (*Ibid.*) Our Supreme Court in *Offner* concluded the city's proposal did not violate the Constitution: "In view of the admitted fact that the amount of rentals that the city may be required to pay in any single fiscal year, together with its other debts and liabilities will not exceed its income and

9

revenue for such year, it cannot be said that the proposed agreements violate the debt limitation provision of the Constitution." (*Id*. at p. 487.)

Borrowing language from *Offner*, plaintiff argues that a lease-leaseback agreement under section 17406 must be entered into in "good faith" and must not be a "subterfuge" to avoid the competitive bid requirements of section 17417. *Offner*, however, is not authority for plaintiff's argument. The case addressed the constitutional prohibition against a local government entity incurring indebtedness in excess of its income and revenue for the year; the *Offner* court did not purport to impose additional requirements on a "lease" whenever the term is used in a statute. To the extent *Offner* may be applied in this case, it means only that defendants' lease-leaseback agreement cannot be a "subterfuge" to avoid the constitutional provision on indebtedness, but plaintiff in this case makes no claim that the School District is in violation of the debt limit provision of the state Constitution.

We also note that the arguments plaintiff raises here have been considered by two courts in previous cases challenging school districts' use of lease-leaseback construction agreements under section 17406. (See *Davis*, *supra*, 237 Cal.App.4th at pp. 284-287; *McGee*, *supra*, 247 Cal.App.4th at pp. 243-244.) In both cases, attorney Carlin represented the plaintiffs, and the appeals followed successful demurrers by the defendant school districts and construction firms. (*Davis*, at pp. 269, 271; *McGee*, at pp. 238-239.)

In *McGee*, *supra*, our colleagues in the Second District rejected the suggestion that *Offner* imposed additional requirements for lease-leaseback agreements beyond the three required elements set forth in section 17406. (*McGee, supra,* 247 Cal.App.4th at p. 244.) The *McGee* court reasoned that the plaintiffs' "efforts to engraft additional requirements . . . are not based on the plain language of the statute." (*Ibid.* [noting that, in contrast to *Offner*, the plaintiffs' claims did "not involve a contract that potentially violated the constitutional provision on indebtedness"].)

But the Court of Appeal in the Fifth District reached a different result in *Davis*, *supra*, 237 Cal.App.4th 261. There, the court held, "[O]ur review of the entire legislative scheme, the ostensible objects it seeks to achieve, the evils to be remedied, and the

10

underlying public policies lead us to conclude the word 'lease' refers to the substance of the transaction and means more than a document designated a lease by the parties. Moreover, to fulfill the primary statutory purpose of providing financing for school construction, the arrangement must include a financing component." (*Id*. at p. 284.)

The *Davis* court explained how it would determine whether a leaseback is a "true" (or genuine) lease as follows: "We conclude the true legal effect of the leaseback in question is based on all the terms of the document. [Citation.] Provisions in the document that are significant include those that define (1) who holds what property rights and when those rights and interests are transferred between the parties and (2) the amount and timing of the payments. [Citation.] The payment provisions, particularly the length of the period over which payments are made, are important in this context because the primary purpose of the legislation was to provide a source of financing for school construction and the payment provisions will show whether the project is being financed through the contractor or whether the school district is paying for the project by using funds from other source." (*Davis*, *supra*, 237 Cal.App.4th at p. 285.) The court concluded the challenged "Facilities Lease" in that case was "not a true lease that provided financing for the project." In reaching its conclusion, the *Davis* court relied on its determination that "the substance of the payment terms in the Facilities Lease is that of compensation for construction, not payment for a period of use of the facilities" and the fact that "[the] Contractor did not provide any financing to [the school district] under the Facilities Lease." (*Id*. at p. 286.)

We decline to follow *Davis*, which went far beyond the language of section 17406 in adopting ill-defined additional factors to determine whether the leaseback portion of a lease-leaseback agreement is a "true" lease and imposing a requirement that the contractor provide financing for the project. Instead, we agree with *McGee*, which rejected *Davis* and declined to read additional requirements into section 17406. The *Davis* court relied on what it determined to be the intended purpose of section 17406 to impose requirements not expressed in the statute, but, as *McGee* observed, "our role is to interpret the language of the statute, not to rewrite the statute." (*McGee*, *supra*, 247

11

Cal.App.4th at p. 244.) "We may not, under the guise of interpretation, insert qualifying provisions not included in the statute." (*Estate of Griswold* (2001) 25 Cal.4th 904, 917.)

In its first cause of action, plaintiff alleged defendants' lease-leaseback agreement violated article 2 because it was not genuine and it failed to provide financing. Based on the foregoing discussion, we conclude the trial court correctly sustained defendants' demurrers as to this cause of action.

3. *Third Cause of Action: Section 17406's Exemption from Competitive Bidding Requirements Applies to the Lease and the Leaseback*

Section 17406 allows school districts to enter lease agreements, "[n]otwithstanding Section 17417" and "without advertising for bids." Plaintiff contends the exemption from competitive bidding applies to a school district's agreement to lease its property to a contractor, but does not apply to the associated agreement contemplated by section 17406 that the contractor lease the property with improvements back to the school district. In other words, plaintiff argues, the exemption from section 17417's competitive bidding requirements applies to the lease, but not to the leaseback, of a lease-leaseback agreement.

"We give the words of the statute 'a plain and commonsense meaning' unless the statute specifically defines the words to give them a special meaning. [Citations.] If the statutory language is clear and unambiguous, our task is at an end, for there is no need for judicial construction." (*MacIsaac*, *supra*, 134 Cal.App.4th at p. 1083.) We are not the first court to consider plaintiff's interpretation of section 17406. Three appellate courts have addressed and rejected it. (*Los Alamitos*, *supra*, 229 Cal.App.4th at pp. 1229-1230; *Davis*, *supra*, 237 Cal.App.4th at pp. 280-282; *McGee*, *supra*, 247 Cal.App.4th at p. 246.) We agree with our sister courts.

"[T]he ordinary meaning of the word 'notwithstanding' is 'in spite of.' [Citation.] It is well established that the phrase 'notwithstanding any other provision of law' is a term of art that expresses a legislative intent to have the specific statute control despite the existence of other law that might govern. [Citation.] Therefore, . . . the phrase '[n]otwithstanding Section 17417' means the bidding procedures set forth in section

12

17417 do not apply to agreements covered by section 17406(a)(1). The phrase 'without advertising for bids' provides a further indication that competitive bidding is not required for agreements falling within section 17406(a)(1)." (*Davis*, *supra*, 237 Cal.App.4th at pp. 281-282.)

Section 17406 applies to a lease of real property by a school district "if the instrument by which such property is let [also] requires the lessee therein to construct on the demised premises, or provide for the construction thereon of, a building or buildings for the use of the school district during the term thereof, and provides that title to that building shall vest in the school district at the expiration of that term." (§ 17406, subd. (a).) Thus, section 17406 contemplates a single instrument that provides for both a lease (of real property by the school district) and a leaseback (of constructed facilities to the school district).[12] As to such an instrument, section 17417's competitive bidding requirements do not apply. We agree with the *Davis* court's reasoning on this question. "The reference to an instrument that requires the lessee under a site lease 'to construct on the demised premises . . . a building or buildings for the use of the school district' clearly encompasses the construction services provided by a contractor to a school district under a facilities lease. [Citation.] Therefore, a facilities lease that specifies the terms of construction is eligible for the exception [from section 17417's competitive bidding requirements]." (*Davis*, *supra*, 237 Cal.App.4th at p. 282.)

We believe the language of section 17406 is clear and unambiguous, and no further analysis is needed. But we also observe that lease-leaseback agreements have long been understood to be exempt from competitive bidding as demonstrated by, first,

---

[12] As we have mentioned, the School District and Taber entered into two separate contracts (the master site lease and the master facilities lease), which, together, we refer to as a lease-leaseback agreement. These two contracts together also constitute a single "instrument" for purposes of section 17406. (Plaintiff does not claim defendants' lease-leaseback agreement is invalid because it is composed of two contracts instead of a single instrument.) The master site lease required the parties to enter into the master facilities lease, which was incorporated by reference and referred to throughout the master site lease. The master facilities lease provided that it would take effect only if executed by the School District and Taber within three days of execution of the master site lease.

13

an Attorney General's opinion from 1973 and, second, legislative action in the 2003-2004 session.

First, "[t]he Attorney General interpreted an earlier version of Education Code section 17406 and concluded it exempted school district lease-leaseback arrangements from the competitive bidding process."[13] (*Los Alamitos*, *supra*, 229 Cal.App.4th at p. 1227.) "In 1973, the Attorney General interpreted Education Code former section 15705 as follows: 'There is no question but that the Legislature has plainly, unambiguously, and explicitly imposed notice and bid requirements with respect only to construction authorized by [Education Code former] section 15706 and not to that authorized by section 15705. Considerations of wisdom, expediency, or policy suggest a contrary conclusion but such factors may be effectuated only by amendment through the legislative process rather than judicial construction. Such judicial restraint prevents inadvertently invalidating such construction, without notice or bids, as may have occurred pursuant to the provisions of section 15705. [¶] *It is concluded that the Legislature excluded an arrangement entered into under section 15705 from the notice and bid requirements.* Because a school district is not required to obtain bids for lease arrangements under section 15705, it may lease its property for the purpose of permitting the construction thereon of school buildings which the district will lease at such rental rates as the governing board deems in the best interests of the district without reference to

---

[13] "The predecessor of section 17406 provided: 'The governing board of a school district may let, at a minimum rental of one dollar ($1) a year, to any person, firm, or corporation any real property which belongs to the district if the instrument by which such property is let requires the lessee therein to construct on the demised premises, or provide for the construction thereon of, a building or buildings for the use of the school district during the term thereof, and provides that title to such building shall vest in the school district at the expiration of such term. Such instrument may provide for the means or methods by which such title shall vest in the school district prior to the expiration of such term, and shall contain such other terms and conditions as the governing board may deem to be in the best interest of the school district.' (Ed. Code, former § 15705; Stats.1959, ch. 2, § 1, pp. 595, 1086-1087.)" (*Los Alamitos*, *supra*, 229 Cal.App.4th at p. 1227.)

14

competitive bidding.' (56 Ops.Cal.Atty.Gen. 571, 581 (1973).)" (*Id.* at p. 1228, italics added.)

Second, the Legislature's subsequent action on section 17406 bolsters the Attorney General's opinion. During the 2003-2004 session, the Legislature passed a bill that would have amended section 17406 to add "the following provision: ' "(a) In order to enable school districts to let real property for the purpose of acquiring, financing, or constructing facilities, and notwithstanding Section 17417, the governing board of a school district, *through the competitive proposal process* set forth in Article 2.2 (commencing with Section 17429.1), may let, for a minimum rental of one dollar ($1) a year, to any person, firm, or corporation any real property that belongs to the district if the instrument by which the property is let requires the lessee therein to construct on the demised premises . . . ." (Legis. Counsel's Dig., Assem. Bill No. 1486 (2003-2004 Reg. Sess.).)' " (*McGee*, *supra*, 247 Cal.App.4th at pp. 244-245.) However, this bill was vetoed by Governor Schwarzenegger.[14] *Los Alamitos* and *McGee* agreed that this "attempt to amend section 17406 to delete reference to the language 'without advertising for bids' implies that section 17406 as it reads now does not require competitive bidding." (*Los Alamitos*, *supra*, 229 Cal.App.4th at p. 1229; *McGee*, *supra*, 247 Cal.App.4th at p. 245 [quoting *Los Alamitos*].)

Plaintiff's arguments for a contrary interpretation of section 17406 are not persuasive. Plaintiff argues that section 17417's competitive bidding requirements apply whenever a construction project involves real property owned by the school district. But section 17406 also involves real property owned by the school district since it requires a

---

[14] The governor "explained: ' "I am supportive of using a competitive process for public works projects and understand that this bill is needed to clarify that process. However, this bill imposes restrictions on lease-leaseback contracts that could limit competition, inadvertently limit schools['] flexibility, and drive higher administrative costs; thereby potentially increasing the overall cost of school facility construction. [¶] For this reason, I cannot sign this measure." (Governor's veto message to Assem. on Assem. Bill No. 1486 (2003-2004 Reg. Sess.) (Sept. 24, 2004).)" (*McGee*, *supra*, 247 Cal.App.4th at p. 245.)

15

lease of the property to the contractor, and yet it expressly provides for agreements "without advertising for bids," "[n]otwithstanding Section 17417." Plaintiff relies on the maxim of statutory interpretation that the specific controls the general, claiming that section 17406 is the more general statute and section 17417 is more specific on the subject of competitive bidding. We disagree. "Nothing supports the application of this principle to the statutes in this case. To the contrary, section 17406, subdivision (a) begins with the language, '[n]otwithstanding Section 17417,' which shows section 17406 provides an exception to the more general section 17417." (*Los Alamitos*, *supra*, 229 Cal.App.4th at pp. 1229-1230 [rejecting argument that section 17417 is more specific and section 17406 is more general].)

Plaintiff asserts that interpreting section 17406 as exempting lease-leaseback agreements from section 17417's competitive bidding requirements would "lead[] to mischief" because it would enable "the evils of fraud, favoritism and corruption that exist with subjective contractor selection criteria rather than objective contractor selection criteria." But, as the *Los Alamitos* court noted in response to a similar policy argument for imposing competitive bidding requirements on lease-leaseback agreements, " 'absent a statutory requirement, a public entity is not bound to engage in competitive bidding.' " (*Los Alamitos*, *supra*, 229 Cal.App.4th at p. 1229.)[15] While there may be policy reasons for requiring competitive bidding for all school construction projects, we have " 'no

---

[15] Taber further counters that the law provides many exemptions from competitive bidding. Among other statutes, Taber cites various sections of the Public Contract Code, including sections 10187 et seq. (allowing certain state agencies to procure design-build contracts using "best value procurement methodology" *or* lowest cost method), sections 22160 et seq. (same for certain local agencies), sections 6700 et seq. (providing "for an alternative procurement procedure for certain transportation projects"), section 20111, subdivision (c) (exempting from competitive bidding requirements "professional services or advice, insurance services, or any other purchase or service otherwise exempt from this section, or to any work done by day labor or by force account pursuant to Section 20114"), and section 20113 (allowing school districts to make emergency repairs or improvements "without advertising for or inviting bids"). These exemptions show the Legislature purposefully exempts government agencies from competitive bidding requirements in various circumstances.

power to rewrite the statute so as to make it conform to a presumed intention which is not expressed.' " (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633.)

Next, plaintiff claims an interpretation of section 17406 that exempts lease-leaseback agreements from competitive bidding requirements renders section 17417's competitive bidding requirements a nullity. We follow *Los Alamitos*, which rejected this argument. "[The plaintiff] contends that if Education Code section 17406 applies to the entire series of agreements that form a lease-leaseback arrangement between a school district and a contractor, Education Code section 17417 would be rendered a nullity 'as there is no scenario under which Section 17417 would then apply.' Section 17417 applies generally to 'a lease or agreement pursuant to this article.' Title 1, division 1, part 10.5, chapter 4, article 2 of the Education Code applies even more generally to leasing property. There would appear to be many ways in which section 17417 would be used, even if lease-leaseback arrangements are excluded from it." (*Los Alamitos*, *supra*, 229 Cal.App.4th at p. 1230.) As the School District responds, a lease-leaseback delivery method under section 17406 "is just one of the contemplated lease arrangements" under article 2, which governs "leases and agreements relating to real property and buildings to be used by the school district" generally. (§ 17400, subd. (a).)

Finally, plaintiff relies on a report of the executive officer of the State Allocation Board (SAB) prepared for a board meeting on January 28, 2004 (2004 SAB report).[16] In the 2004 SAB report, the executive officer observed, "The use of Education Code (EC) Section 17406 as a project delivery method for public school construction is growing. Increasingly, districts are interpreting this code section to allow the award of a public works project without competitive bid." The report described the growing use of lease-

---

[16] The State Allocation Board implements and administers California's school facilities construction program; its duties include "apportioning money from a state fund and determining which schools are eligible to receive funding." (*Davis*, *supra*, 237 Cal.App.4th at p. 291, fn. 16.) Plaintiff incorporated the 2004 SAB report by reference in the FAC.

leaseback agreements (without competitive bidding) and arguments in favor of, and concerns about, the use of this delivery method.[17]

The 2004 SAB report then provided the staff's opinion of the school districts' use of lease-leaseback agreements without competitive bidding under section 17406. "It is the opinion of staff and SAB counsel that [the] . . . interpretation [that section 17406 exempts lease-leaseback agreements from competitive bidding requirements] expands the meaning of [section] 17406 beyond its simple intent and ignores other requirements in the same article regarding competitive bid requirements for leases ([section] 17417). There is no disagreement that [section] 17406 is clear in allowing districts to lease a district-owned site to a person, firm or corporation when the lessee agrees to construct buildings for the use of the school district. However, the exemption from public bidding allowed in this section applies only to the property lease from the district to the developer. It does not address how the contract for the construction of the buildings is procured nor does it provide an exemption to competitive bidding for that contract."

"If the building to be constructed on the property let to the developer using [section] 17406 is to be leased to the district, Staff believes the provisions of [section] 17417 . . . must be followed. [¶] . . . [¶] Nothing in [section] 17406 provides an exemption from this requirement or, when applicable, from the [Public Contract Code] requirements. Instead, [section] 17406 provides exactly what it states: a simple manner to transfer district property without competitive bid to a developer who has been previously selected by competitive bid to construct a building for the use of the district."

The 2004 SAB report concluded with suggested issues the SAB might wish to consider including, among others, whether construction projects that were not subject to public bidding "should continue to be presented for funding," whether state policy

---

[17] School districts cited guaranteed price, a "[t]eam approach," and the ability to select a known contractor "on the basis of their record of success, recommendations from previous clients and financial strength" as reasons to use lease-leaseback agreements rather than "the traditional design, bid, and build approach." However, the 2004 SAB report identified the concern that construction projects were "not being subjected to the checks and balances of the competitive bid process."

18

makers should investigate school districts' claims that they "need better tools to deliver quality public facilities," and "[w]hether legislation is necessary to clarify the appropriate use of . . . Section 17406 and to clarify, if necessary, the relationship of that section to the entire article on leases . . . ." Notably, the SAB did not accept this report, although legislative board members did express interest in proposed legislation to address the issues raised.

We find the 2004 SAB report unpersuasive on the matter of statutory interpretation. It did not address the language of section 17406 specifying that the leasing "instrument" must also require the lessee to provide construction services. (§ 17406, subd. (a); see *Davis*, *supra*, 237 Cal.App.4th at p. 282.) Instead, we view the report as raising policy concerns, which the SAB staff recognized might be addressed through legislation. In fact, the Legislature did attempt to amend section 17406 in the 2003–2004 session, but the proposed amendment was vetoed. (*McGee*, *supra*, 247 Cal.App.4th at p. 245.)[18]

In sum, a lease-leaseback agreement under the 2014 version of section 17406 is exempt from the competitive bidding requirements of section 17417. Therefore, the trial court properly sustained defendants' demurrers as to plaintiff's third cause of action,

---

[18] In 2016, the Legislature amended section 17406 to require a "best value" method for selecting a contractor. (Stats. 2016, ch. 521, § 2.) The current version of section 17406 provides, in part, that a lease-leaseback construction agreement "shall be awarded based on a competitive solicitation process to the proposer providing the best value to the school district, taking into consideration the proposer's demonstrated competence and professional qualifications necessary for the satisfactory performance of the services required. Before awarding an instrument pursuant to this section, the governing board of the school district shall adopt and publish required procedures and guidelines for evaluating the qualifications of proposers that ensure the best value selections by the school district are conducted in a fair and impartial manner." (Current § 17406, subd. (a)(2).) Thus, under the current version of section 17406, a construction project must be open to bidding, but the school district is not required to use the lowest bidder. Section 17417, in contrast, requires the school district to select the lowest responsible bidder.

19

which was based on the claim that the School District was required to comply with section 17417 before entering into a lease-leaseback agreement under to section 17406.

4. *Fifth Cause of Action: Section 17406 Does Not Require a School District to Engage in "Genuine 'Financing'"*

In its fifth cause of action, plaintiff claimed the School District was barred from using a lease-leaseback agreement under section 17406 as a project delivery method because the School District has sufficient funds available to cover the immediate costs of construction of the project, and section 17406 requires "genuine 'financing.' " Following *Davis* and *McGee*, we reject this claim. (*Davis*, *supra*, 237 Cal.App.4th at p. 292; *McGee*, *supra*, 247 Cal.App.4th at pp. 242, 246 [implicitly rejecting the plaintiffs' claim that section 17406 only applies when the school district does not have sufficient funds to finance the cost of construction].)

Plaintiff begins with the premise that article 2 is intended as a method for financing school construction.[19] From this premise, plaintiff takes the position that a school district is prohibited from utilizing section 17406 if the district has sufficient funds to pay for the construction (and therefore does not need financing). But plaintiff's position does not follow from its premise. Section 17406 does not expressly require that a school district lack funds in order to enter a lease-leaseback agreement (*Davis*, *supra*, 237 Cal.App.4th at p. 292), and plaintiff offers no authority for a general rule that a statutorily-provided financing option should be deemed unavailable merely because the entity seeking to use the option has the funds to pay in cash.

Plaintiff again cites the 2004 SAB report as support for its position. In the 2004 SAB report, the executive officer observed that a previous version of article 2 "is about financing." The report continued: "Staff believes that virtually none of the projects currently using lease-leaseback arrangements actually have financing provided by the developer. If a 'lease agreement' other than the site lease exists at all, it serves no

---

[19] Plaintiff cites *Morgan Hill Unified School Dist. v. Amoroso* (1988) 204 Cal.App.3d 1083, 1086, in which the court observed, "The Education Code creates the following method for financing school construction."

significant purpose other than as a construction contract. The full cost of the project is borne by the district using normal funds it has available for capital projects. . . . [¶] Since no financing exists in the lease lease-back arrangement (or there is no lease agreement at all), the use of Article 2 appears to be inappropriate."

The 2004 SAB report does not support plaintiff's position. As the *Davis* court explained in rejecting an identical argument: "[T]he views expressed in the SAB Report do not actually include the interpretation advocated by [the plaintiff]. Specifically, the SAB report does not state that the legislation restricts the availability of the lease-leaseback method to situations where other funding is not available. In other words, the report's reference to a case stating the 'Education Code creates the following method for financing school construction' (*Morgan Hill Unified School Dist. v. Amoroso*, *supra*, 204 Cal.App.3d at p. 1086) does not imply that method is allowed only if other methods of financing are not available." (*Davis*, *supra*, 237 Cal.App.4th at p. 293.)

Consequently, the trial court properly sustained defendants' demurrers as to plaintiff's fifth cause of action.

## C. *Second Cause of Action: Breach of Fiduciary Duty, Breach of Trust*

In the second cause of action against the School District only, plaintiff alleged the members of the board of the School District breached the fiduciary duty imposed upon them by their position, oath of office, and law. Plaintiff relied on the following seven acts or omissions, alleged in paragraph 34 of the FAC: (1) failing to consider less expensive proposals, (2) failing to consider whether the price for the work was reasonable, (3) failing to exercise due diligence to determine whether the price paid could be lower, (4) knowing the price paid could have been lower, (5) failing to solicit alternative bids for the work, (6) failing to proceed in a manner that would secure the best price, and (7) failing to proceed in a manner required by law. Plaintiff sought an order that Taber return "all money paid" under the lease-leaseback agreement by the School District.

The plaintiff in *Davis* asserted a claim of breach of fiduciary duty based on precisely the same allegations and seeking the same relief. (*Davis*, *supra*, 237

21

Cal.App.4th at p. 293.)  The plaintiffs in *McGee* similarly claimed breach of fiduciary duty based on the failure to obtain competitive bids.  (*McGee*, *supra*, 247 Cal.App.4th at p. 242.)  In both cases, the appellate courts concluded the allegations failed to state a claim.  (*Davis*, at p. 294; McGee, at p. 246.)  The *Davis* court explained:  "When a claim for breach of fiduciary duty is asserted against a public official by the Attorney General or a taxpayer, the damage element can be satisfied by alleging the official obtained profits from the unauthorized act.  [Citation.]  In these cases, the relief available is restitution, which can include the disgorgement of profits obtained by the public official.  [Citation.]  [¶] . . . Here, the [the operative complaint] requests that Contractor return all money paid to it under the Lease-leaseback Contracts, but does not allege Contractor was subject to a fiduciary duty.  As to the persons who allegedly breached their fiduciary duty (i.e., Fresno Unified's board), the [operative complaint] does not allege they profited from the transactions and does not request restitution or the disgorgement of profits.  Furthermore, the relief sought for the alleged breach of fiduciary duty is against Contractor, a party that did not have a fiduciary duty.  Accordingly, the second cause of action failed to allege facts sufficient to state a claim for breach of fiduciary duty."  (*Davis*, at pp. 293-294.)

Plaintiff's second cause of action fails for the same reasons the claim failed in *Davis*.  On appeal before us, plaintiff does not dispute the *Davis* court's analysis, now acknowledging its original claim of breach of fiduciary duty was "was off the mark."  Instead, plaintiff argues its allegations support a claim for breach of trust.  This argument also lacks merit.

Plaintiff quotes *Terry v. Bender* (1956) 143 Cal.App.2d 198, 206-207, in which the court wrote:  "A public office is a public trust created in the interest and for the benefit of the people.  Public officers are obligated, *virtute officii*, to discharge their responsibilities with integrity and fidelity.  Since the officers of a governmental body are trustees of the public weal, they may not exploit or prostitute their official position for their private benefits.  When public officials are influenced in the performance of their public duties by base and improper considerations of personal advantage, they violate

22

their oath of office and vitiate the trust reposed in them, and the public is injured by being deprived of their loyal and honest services. It is therefore the general policy of this state that public officers shall not have a personal interest in any contract made in their official capacity. . . . A transaction in which the prohibited interest of a public officer appears is held void both as repugnant to the public policy expressed in the statutes and because the interest of the officer interferes with the unfettered discharge of his duty to the public. The public officer's interest need not be a direct one, since the purpose of the statutes is also to remove all indirect influence of an interested officer as well as to discourage deliberate dishonesty. Statutes prohibiting such 'conflict of interest' by a public officer are strictly enforced."

Plaintiff asserts that nothing prevented the School District from soliciting sealed bids for the project. That may be. But, " 'absent a statutory requirement, a public entity is not bound to engage in competitive bidding.' " (*Los Alamitos*, *supra*, 229 Cal.App.4th at p. 1229.)

Plaintiff also relies on Proposition 39, enacted in November 2000, which amended the state Constitution to allow the issuance of bonds for the construction of school facilities if specified conditions are met and if approved by 55 percent of a school district's voters. (See *San Lorenzo Valley Community Advocates for Responsible Educ. v. San Lorenzo Valley Unified School Dist*. (2006) 139 Cal.App.4th 1356, 1396, fn. 9.) Generally, a local government entity must obtain approval of two-thirds of the voters of the entity in order to incur indebtedness in the form of general obligation bonds. (*Ibid*.; Cal. Const., art. XVI, § 18, subd. (a).) Plaintiff argues, "Implicit in Proposition 39's reduction of the passage rate from 66% to 55% for school construction bonds is an obligation on the part of [the School] District's to maximize the amount of facilities that can be obtained with those bond dollars. By [failing to consider less expensive proposals, and the acts and omissions alleged in the FAC, paragraph 34)], [the School] District's decision to award [Taber] $14.7 million dollars worth of construction contracts was arbitrary and capricious and in breach of their duty of care owed relative to the [School] District's expenditure of its limited . . . school construction bond proceeds." Plaintiff

23

offers no authority for its position that Proposition 39 imposed additional duties on school districts, which are not expressly provided for in either the proposition or section 17406.

Returning to plaintiff's theory of breach of trust, "the general policy of this state [is] that public officers shall not have a personal interest in any contract made in their official capacity." (*Terry v. Bender*, *supra*, 143 Cal.App.2d at p. 206.) But plaintiff does not allege any member of the Board of the School District has a personal interest in the lease-leaseback agreement in this case. As a result, plaintiff's allegations do not state a claim for breach of the public trust.

**D.** *Fourth Cause of Action: Conflict of Interest*

Plaintiff's fourth cause of action for conflict of interest was asserted against Taber only. Plaintiff alleged Taber was "employed" by the School District "to provide professional preconstruction services" relating to the project at issue (HVAC modernization) and other potential projects, and in providing these services, Taber "performed the functions and filled the roles and positions of officers, employees and agents of [the School] District who would ordinarily perform and provide . . . professional, design, and financial functions and advise the [School] District relative to same." Plaintiff further alleged that in providing these services, Taber "was in a position to advise and provide considerable influence upon [the School] District's school board and staff as to what actions they should take relative to the Project." Plaintiff claimed conflicts of interest arose "under the common law conflict of interest doctrine" and Government Code section 1090 when Taber was subsequently awarded the lease-leaseback agreement to construct the project at issue.

The trial court sustained Taber's demurrer as to the fourth cause of action, explaining, "plaintiff cites no legal authority supporting the proposition that defendant Taber's alleged provision of 'preconstruction services' created an actionable conflict of

24

interest."[20]  We disagree, and conclude plaintiff may go forward on the claim of conflict of interest.

      1.    *Statutory and Common Law Conflict of Interest*

Government Code section 1090 provides in relevant part, "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members." (Gov. Code, § 1090, subd. (a).)  The statute "codifies the long-standing common law rule that barred public officials from being personally financially interested in the contracts they formed in their official capacities." (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1072 (*Lexin*).)  "The common law rule and section 1090 recognize '[t]he truism that a person cannot serve two masters simultaneously. . . .' [Citations.]  'The evil to be thwarted by section 1090 is easily identified:  If a public official is pulled in one direction by his financial interest and in another direction by his official duties, his judgment cannot and should not be trusted, even if he attempts impartiality.' " (*Id.* at p. 1073.)

Government Code section 1092 provides a remedy for violation of Government Code section 1090:  "Every contract made in violation of any of the provisions of Section 1090 may be avoided at the instance of any party except the officer interested therein. No such contract may be avoided because of the interest of an officer therein unless the contract is made in the official capacity of the officer, or by a board or body of which he or she is a member." (Gov. Code, § 1092, subd. (a).)

      2.    *Standing*

Defendants belatedly argue that plaintiff lacks standing to bring a claim of conflict of interest.  Although defendants did not make this argument in their demurrers, we consider it because standing may be raised for the first time on appeal. (*Horn v. County of Ventura* (1979) 24 Cal.3d 605, 619.)  Defendants contend only a "party" to the contract at issue has standing under the language of Government Code section 1092, and plaintiff

_____

[20] *Davis* and *McGee* had not been decided at the time of the trial court's ruling.

cannot rely on taxpayer standing because the School District has no mandatory duty to bring a lawsuit to avoid the lease-leaseback agreement.  Defendants rely solely on *San Bernardino County v. Superior Court* (2015) 239 Cal.App.4th 679 (*San Bernardino*).  But, as we discuss, cases before and after *San Bernardino* have recognized that an action under Government Code section 1090 may be brought by a taxpayer, and *San Bernardino* is distinguishable.

A taxpayer may bring suit against government bodies pursuant to Code of Civil Procedure section 526a and based on common law.  (*Los Altos Property Owners Assn. v. Hutcheon* (1977) 69 Cal.App.3d 22, 26 (*Hutcheon*).)  Section 526a permits " '[a]n action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property *of a county, town, city or city and county of the state*, . . . against any officer thereof, or any agent, or other person, acting in its behalf.' "  A common law taxpayer suit is limited to the "grounds [of] fraud, collusion, *ultra vires*, or a failure to perform a duty specifically enjoined."  (*Hutcheon*, at p. 26.)  "The primary purpose of [section 526a], originally enacted in 1909, is to 'enable a large body of the citizenry to challenge governmental action which would otherwise go unchallenged in the courts because of the standing requirement.' [Citation.]  [¶]  California courts have consistently construed section 526a liberally to achieve this remedial purpose."  (*Blair v. Pitchess* (1971) 5 Cal.3d 258, 267-268.)

For example, in *Gilbane Building Company v. Superior Court* (2014) 223 Cal.App.4th 1527 (*Gilbane*), a taxpayer association brought an action under Government Code section 1090, based on allegations that construction firms, including the defendant Gilbane, provided gifts to officials of a high school district in exchange for construction contracts worth several million dollars.  (*Id*. at p. 1530.)  In a demurrer, Gilbane argued the taxpayer association lacked standing, but Division One of the Fourth District Court of Appeal rejected this argument.  The court explained:  "Taxpayers may sue under section 1090 in order to have improper contracts declared void.  [Citations.]  These lawsuits may be against the public agency as well as the private parties who entered into the improper contract with the public agency."  (*Id*. at p. 1532.)

26

The *Gilbane* court acknowledged the long-standing rule that " '[a] taxpayer may not bring an action on behalf of a public agency unless the governing body has a duty to act, and has refused to do so. If the governing body has discretion in the matter, the taxpayer may not interfere.' " (*Gilbane*, *supra*, 223 Cal.App.4th at p. 1532.)[21] But "[w]here the public agency has expended funds illegally or for an unlawful purpose and its management is in the hands of the persons accused of the wrongdoing, a taxpayer is not required to make a demand on the public agency as it would be unavailing." (*Id*. at p. 1533.) The court concluded that, if the taxpayer association's allegations were true, the high school district "expended funds illegally and the subject [construction] contracts are void, not merely voidable. Whether the contracts are void is not a matter within the [the high school] District's discretion." (*Ibid*.) Accordingly, the court held the taxpayer association had standing to challenge the construction contracts between Gilbane and the high school district under Government Code section 1090.

The *Davis* court also recognized that a taxpayer has standing to bring a claim under Government Code section 1090. In *Davis*, as here, the defendants did not argue in the trial court that the plaintiff lacked standing, but the court observed in passing, "The term 'any party' [in Government Code section 1092] is not restricted to parties to the contract. Defendants did not base their demurrer on the ground [the plaintiff] Davis lacked standing to bring the conflict of interest claim under Government Code section 1090 since it is recognized that either the public agency or a taxpayer may seek relief for

---

[21] The court explained the rule: " ' "The rule is that the municipality, through its governing body, has control of the property and general supervision over the ordinary business of the corporation; and there would be utter confusion in such matters if every citizen and taxpayer had the general right to control the judgment of such body, or usurp the office. Where the thing in question is within the discretion of such body to do or not to do, the general rule is that then neither by *mandamus, quo warranto*, or other judicial proceeding, can either the state or a private citizen question the action or nonaction of such body; nor in such cases can a private citizen rightfully undertake to do that which he thinks such body ought to do. It is only where performance of the thing requested is enjoined as a duty upon said governing body that such performance can be compelled, or that a private citizen can step into the place of such body and himself perform it." ' " (*Gilbane*, *supra*, 223 Cal.App.4th at pp. 1532-1533.)

27

a violation of section 1090. (E.g., *Thomson v. Call* (1985) 38 Cal.3d 633, [taxpayer suit successfully challenged validity of land transfer from city council member through intermediaries to city]; see Kaufmann & Widiss, The California Conflict of Interest Laws (1963) 36 So.Cal. L.Rev. 186, 200.)" (*Davis*, *supra*, 237 Cal.App.4th at p. 297, fn. 20.)[22]

A month after *Davis* was decided, Division Two of the Fourth District Court of Appeal decided *San Bernardino*, the case upon which defendants now rely. In *San Bernardino*, a land owner and San Bernardino County (County) reached a settlement agreement in an inverse condemnation matter in 2006. The County then brought a validation action and obtained a judgment declaring the settlement agreement and the bonds issued to satisfy the inverse condemnation judgment valid in 2007. Five years later, taxpayer organizations sued the County and the landowner, seeking to void the settlement agreement under Government Code section 1090 based on allegations that a County supervisor received bribes from the landowner in exchange for his vote to approve the settlement agreement. (The supervisor pleaded guilty to bribery-related charges in 2011 and was no longer a County supervisor at the time the lawsuit was filed.) (*San Bernardino*, *supra*, 239 Cal.App.4th at pp. 681-683.) The *San Bernardino* court held that only a party to the challenged contract has standing to bring a claim for violation of section 1090. (*Id.* at p. 684.)[23]

---

[22] The *Davis* court cited *Thomson v. Call*, a California Supreme Court case from 1985, and there are examples of taxpayers bringing claims under Government Code section 1090 as far back as 1946. (See *Raymond v. Bartlett* (1946) 77 Cal.App.2d 283, 284-285.)

[23] While the *Davis* court observed the phrase "any party" in Government Code section 1092 was "not restricted to parties to the contract" (*Davis*, *supra*, 237 Cal.App.4th at p. 297, fn. 20), the *San Bernardino* court reached the opposite conclusion. The court reasoned, "Nothing in the plain language of either section 1090 or section 1092 grants nonparties to the contract, such as plaintiffs, the right to sue on behalf of a public entity that may bring a claim as provided in section 1092, but has not done so. Indeed, the Legislature's choice of the word 'party' in section 1092—as opposed to, say, 'person'—suggests the Legislature intended only parties to the contract at issue normally to have the right to sue to avoid contracts made in violation of section 1090." (*San Bernardino*, *supra*, 239 Cal.App.4th at p. 684.)

28

The *San Bernardino* court further held that neither Code of Civil Procedure section 526a nor common law conferred standing to taxpayers to bring claims under Government Code section 1090. (*San Bernardino*, *supra*, 239 Cal.App.4th at pp. 685-688.) The court explained its reasoning: "[U]nder either Code of Civil Procedure section 526a or the common law, '[t]axpayer suits are authorized only if the government body has a duty to act and has refused to do so. If it has discretion and chooses not to act, the courts may not interfere with that decision.' [Citation.] 'It is the general rule that a taxpayer cannot maintain an action in behalf of [a government entity] to enforce a claim or demand inuring to the [government entity].' [Citation.] 'It has long been held that a government entity's decision whether to pursue a legal claim involves the sort of discretion that falls outside the parameters of waste under section 526a and cannot be enjoined by mandate.' [Citation.] And because deciding whether to pursue a legal claim is generally an exercise of discretion, rather than 'a duty specifically enjoined,' the common law too does not normally provide the taxpayer a cause of action to pursue a legal claim on behalf of the government entity." (*Id*. at pp. 686-687.)[24]

The plaintiffs in *San Bernardino* "argue[d] that 'compliance with [Government Code] Section 1090 is a nondiscretionary duty specifically enjoining [the County] from making the $102 million settlement agreement in exchange for bribes. . . .' " (*San Bernardino*, *supra*, 239 Cal.App.4th at p. 687.) The court was not persuaded: "This argument would be more to the point if plaintiffs were seeking to enjoin the County from entering into such a settlement agreement. But that ship has long since sailed. The issue now is the County's decision (or lack thereof) with respect to bringing suit on the basis of the alleged violation of section 1090, and whether this decision is an exercise of discretion or a mandatory duty that County—so far, at least—has failed to perform. For

---

[24] In the passage quoted, the *San Bernardino* court cited three cases: *Daily Journal Corp. v. County of Los Angeles* (2009) 172 Cal.App.4th 1550, *Elliott v. Superior Court* (1960) 180 Cal.App.2d 894, 897, and *Silver v. City of Los Angeles* (1961) 57 Cal.2d 39. (*San Bernardino*, *supra*, 239 Cal.App.4th at pp. 686–687.) However, none of these three cases involved a taxpayer attempting to bring a conflict of interest claim under Government Code section 1090.

the reasons stated above, it is an exercise of discretion." (*Ibid*.) The court noted that the taxpayer associations made no allegations "that any present County official was involved in the alleged bribery scheme leading to [the former County supervisor]'s guilty plea, or is otherwise engaged in fraud or collusion." (*Id*. at p. 688.)

*McGee* was decided after *San Bernardino*, and the Second District declined to follow it. Instead, the *McGee* court, citing *Davis*, held the plaintiffs had standing to challenge lease-leaseback construction contracts under Government Code section 1090. (*McGee*, *supra*, 247 Cal.App.4th at pp. 247-248.) The court explained: "*Davis* is closer to this case than *San Bernardino*. As in *Davis*, this case involved a validation action in which the court had authority to set aside void contracts. A contract in violation of section 1090 is void. [Citation.] In contrast, in *San Bernardino,* [the] plaintiffs' challenge to the agreement was barred by a prior validation judgment. [Citation.] Additionally, in contrast to *San Bernardino*, this case did not involve a decision by former school board members, but was brought shortly after the District approved the contracts. [Citation.] Further, in contrast to the *San Bernardino* court, we find *Thomson v. Call*, *supra*, 38 Cal.3d 633, apposite as our high court could not have concluded a contract was invalid in violation of section 1090 without implicitly concluding that the taxpayers challenging it had standing to challenge it." (*McGee*, at p. 248.)

We conclude that *Davis* and *McGee* are more like this case than *San Bernardino*, and the weight of authority supports permitting a taxpayer to bring a claim under Government Code section 1090 under the circumstances here. If the lease-leaseback agreement in this case violates section 1090, then it is void, not merely voidable. Whether the lease-leaseback agreement is void is not a matter within the School District's discretion. (*Gilbane*, *supra*, 223 Cal.App.4th at p. 1533.) And, even assuming *San Bernardino* was correctly decided under its facts, the case is distinguishable (as it was in *McGee*). First, in *San Bernardino*, a prior, validation action had concluded long before the plaintiffs sued; here, plaintiff's action is itself a reverse validation action. Second, in *San Bernardino*, the person with the alleged conflict of interest was no longer a County supervisor at the time the taxpayer lawsuit was filed, and there were no allegations

30

"showing that any present County official was involved in the alleged" conflict of interest.  (*San Bernardino*, *supra*, 239 Cal.App.4th at p. 688.)  But in the present case, the party with an alleged conflict of interest, Taber, is still allegedly involved in the challenged transaction.

In short, we hold plaintiff has standing to bring a claim of conflict of interest.[25]

3.    *Analysis*

We also follow *Davis* and *McGee* on the analysis of whether allegations such as plaintiff's state a claim of conflict of interest.  As we have described, Government Code section 1090's proscription applies to "[m]embers of the Legislature, state, county, district, judicial district, and city officers or employees."  (Gov. Code, § 1090, subd. (a).)[26]  Such individuals are barred from being "financially interested in any contract made by them in their official capacity, or by any body or board of which they are members."  (*Ibid*.)  Yet, despite the reference to " 'officers or employees' " and " 'any contract made by them,' " it has been held in the civil context that Government Code section 1090 may apply to a corporate independent contractor to a government body if the contractor serves a public function and advises the government body on the making of

---

[25] Taber further argues on appeal that plaintiff lacks standing to bring *any* of its claims, citing *San Bernardino*, *supra*, 239 Cal.App.4th 679.  Given our conclusion that plaintiff has standing to bring a claim of conflict of interest, this argument obviously fails.  We note the contractor-defendant in *McGee* also argued that *San Bernardino* stood for the proposition that the plaintiffs lacked standing even to bring their claims under the Education Code, but *McGee* rejected the argument because *San Bernardino* "consider[ed] only a cause of action for conflict of interest."  (*McGee*, *supra*, 247 Cal.App.4th at p. 248, fn. 4.)  Moreover, Taber acknowledges that "any taxpayer who feels the public entity has entered a contract contrary to the law, may bring a timely action under Code of Civil Procedure section 863 [reverse validation] . . . or a timely action under Code of Civil Procedure section 526a [taxpayer suit]."  Here, plaintiff alleged that the action was being brought under Code of Civil Procedure section 863 and Code of Civil Procedure section 526a.

[26] Similarly, the common law rule on conflicts of interest applies to "public officials."  (*Lexin*, *supra*, 47 Cal.4th at p. 1072.)

31

the contract. (*McGee*, *supra*, 247 Cal.App.4th at p. 249; *HUB City Solid Waste Services, Inc. v. City of Compton* (2010) 186 Cal.App.4th 1114, 1124-1125 (*HUB City*.)

First, it has long been recognized that "[a] person merely in an advisory position to a city is affected by the conflicts of interest rule." (*Schaefer v. Berinstein* (1956) 140 Cal.App.2d 278, 291.) Second, " '[t]he fact that someone is designated an independent contractor is not determinative; the statute applies to independent contractors who perform a public function.' " (*California Housing Finance Agency v. Hanover/California Management and Accounting Center, Inc*. (2007) 148 Cal.App.4th 682, 690 [approving quoted statement as a jury instruction] (*Hanover*).) In *HUB City*, the court explained the determination of whether an individual is considered an officer or employee for purpose of the statute "turns on the extent to which the person influences an agency's contracting decisions or otherwise acts in a capacity that demands the public trust." (*HUB City*, *supra*, 186 Cal.App.4th at p. 1125.) In *HUB City*, the defendant Aloyan advised the city of Compton's assistant city manager on establishing an in-house waste management division. Compton then entered into a management agreement with Aloyan's shell company, under which Aloyan's company was designated "an independent contractor but assumed many of the city's waste management needs" by " 'providing the private management' of the city's in-house waste operation." (*Id*. at p. 1119.) At trial, evidence showed "Aloyan had discretion over which vendors to solicit, and influenced the city's staffing decisions. He assisted Compton with the acquisition of insurance, and discussed the possibility of outsourcing waste hauling operations to a private contractor. Under the agreement Aloyan acted as the director of the in-house waste division, working alongside city employees, overseeing day-to-day operations of Compton's waste management division, and taking responsibility for public education and compliance with state mandated recycling and waste reduction efforts." (*Id*. at p. 1120.) Rejecting Aloyan's argument that he was not a public official or employee under Government Code section 1090, the Court of Appeal held, "A person in an advisory position to a city may fall within the scope of section 1090. In particular, independent contractors whose official capacities carry the potential to exert considerable influence

32

over the contracting decisions of a public agency may not have personal interests in that agency's contracts." (*Id*. at pp. 1124-1125.)

Third, in *Davis* (reviewing the sufficiency of allegations following a successful demurrer), the Court of Appeal held that Government Code section 1090 could apply to corporate consultants. Considering a claim of conflict of interest based on a preconstruction services agreement, the *Davis* court reasoned: "[A]s to whether the word 'employees' should be interpreted to exclude corporate consultants, we conclude that corporate consultants should not be categorically excluded from the reach of Government Code section 1090. Such a statutory interpretation would allow the use of the corporate veil to insulate conflicts of interest that otherwise would violate the prohibition against local government officers and employees from making contracts in which they are financially interested. A corporate consultant is as capable of influencing an official decision as an individual consultant. Because the statute's object is to limit the *possibility* of any influence, direct or indirect, that might bear on an official's decision [citation], we conclude the allegations that Contractor served as a professional consultant to Fresno Unified and had a hand in designing and developing the plans and specifications for the project are sufficient to state that Contractor (1) was an 'employee' for purposes of Government Code section 1090 and (2) participated in making the Lease–leaseback Contracts." (*David, supra,* 237 Cal.App.4th at pp. 300-301.)

Likewise, *McGee* concluded the plaintiffs stated a claim of conflict of interest sufficient to withstand demurrer based on similar allegations. The court explained: "[The] plaintiffs allege that [contractor-defendant] Balfour 'filled the roles and positions of officers, employees and agents of [the District.].' At this early stage in the proceedings, the allegation must be credited. [Citation.] As in *HUB City*, '[a] person in an advisory position to a city may fall within the scope of section 1090.' (*HUB City*, *supra*, 186 Cal.App.4th at p. 1124.) The trial court therefore should have overruled the demurrer to McGee's fourth cause of action." (*McGee*, *supra*, 247 Cal.App.4th at p. 249.)

33

Here, plaintiff alleged Taber "performed the functions and filled the roles and position of officer, employees and agents of [the School] District who would ordinarily perform and provide" and, further, Taber "was in a position to advise and provide considerable influence upon [the School] District's school board and staff as to what actions they should take relative to the Project." Under *Davis*, *McGee*, *HUB City*, and *Hanover*, these allegations are sufficient to state a claim of conflict of interest.

Disagreeing with *Davis* and *McGee*, defendants and amici curiae rely on *People v. Christiansen* (2013) 216 Cal.App.4th 1181 (*Christiansen*), which refused to extend Government Code section 1090 to independent contractors in the criminal context. (The trial court also relied on *Christiansen*. Because "employees" is not defined in the statute, the *Christiansen* court applied the common law test of employment. "Under the common law test, independent contractors are not employees." (*Id*. at p. 1189.) The court declined to extend *Hanover* and *HUB City* to a criminal prosecution. "We express no opinion on the soundness of those opinions in the *civil* context, but we hold that their expansion of the statutory term 'employees' to apply to independent contractors does not apply to *criminal* prosecutions for violation of section 1090. At least for purposes of criminal liability under section 1090, an independent contractor is not an employee." (*Ibid*.) Declining to follow *Hanover*, the *Christiansen* court explained: "First, it fails to follow the Supreme Court's guidance concerning interpretation of the undefined statutory term 'employees.' [Citation.] Second, it is a civil case, and the matter before us is a criminal case. Third, none of the cases cited in [*Hanover*] provides any support for the proposition that an independent contractor can be an employee within the meaning of section 1090." (*Ibid*.) The court declined to follow *HUB City*, which adopted *Hanover*'s broad interpretation of "employees," for the same reasons. (*Id*. at p. 1190.)[27]

---

[27] The issue whether an individual who performs work for a public entity and qualifies as an independent contractor for purposes of tort liability at common law may be subject to criminal liability under Government Code section 1090 is currently pending before the California Supreme Court in *People v. Superior Court (Sahlolbei)*, review granted April 13, 2016, S232639. The court heard oral argument in *Sahlolbei* on April 4, 2017.

34

*Davis* harmonized *Christiansen*, *Hanover*, and *HUB City*, concluding that *Christiansen*'s narrow definition of the term "employees" "is appropriate in the context of criminal prosecution, but is not appropriate in the context of civil actions seeking to invalidate a contract with a public entity." (*Davis*, *supra*, 237 Cal.App.4th at p. 300.) "In *Stigall* [*v. City of Taft* (1962) 58 Cal.2d 565], a civil action, the Supreme Court interpreted the statutory terms broadly to implement the objectives of the conflict of interest statute and did not rely on technical definitions or rules to limit the reach of the statute. Similarly, we conclude that technical definitions of the term 'employee' taken from other areas of law should not be used to limit the scope of Government Code section 1090. Therefore, we join the courts in *Hanover* and *Hub City* in concluding that, in civil actions, the term 'employees' in Government Code section 1090 encompasses consultants hired by the local government." (*Ibid*.) *McGee* followed *Davis* and *HUB City*, while recognizing *Christiansen* reached a different result in the criminal context. (*McGee*, *supra*, 247 Cal.App.4th at p. 249 and fn. 5.) We also conclude that, in the civil context, an independent contractor who serves a public function may be subject to Government Code section 1090.

Defendants and amici curiae also cite Public Contract Code section 10365.5, enacted in 1990. This statute applies to contracts made by state agencies, not local government entities. (Pub. Contract Code, § 10335.) It provides in part: "No person, firm, or subsidiary thereof who has been awarded a consulting services contract may submit a bid for, nor be awarded a contract for, the provision of services, procurement of goods or supplies, or any other related action which is required, suggested, or otherwise deemed appropriate in the end product of the consulting services contract." (Pub. Contract Code, § 10365.5, subd. (a).) Taber argues this statute demonstrates that Government Code section 1090 does not apply to consultants who later contract to perform related work because, if it did, the Legislature would not have needed to enact Public Contract Code section 10365.5 in 1990. Amicus curiae California Association of School Business Officials (CASBO) points to the " 'settled rule of statutory construction that where a statute, with reference to one subject contains a given provision, the

35

omission of such provision from a similar statute concerning a related subject is significant to show that a different legislative intent existed with reference to the different statutes.' " (*In re Jennings* (2004) 34 Cal.4th 254, 273.)  CASBO argues that the fact Legislature enacted Pubic Contract Code section 10365.5 but did not amend Government Code section 1090 shows that the term "employees" in Government Code section 1090 should not be expanded to include independent contractors who provide consulting services.

The Court of Appeal in *McGee* responded to the identical argument as follows: "If anything, Public Contract Code section 10365.5 suggests that the Legislature recognized the potential conflict inherent in the same entity serving as a consultant that plans a construction project and the contractor who carries out the project.  The fact that Public Contract Code section 10365.5 applies specifically to consultants does not show that Government Code section 1090 cannot also apply to consultants as the two statutes are not mutually exclusive.  In a proper case, arguably both could apply, but here the District is not governed by Public Contract Code section 10365.5." (*McGee*, *supra*, 247 Cal.App.4th at p. 250.)

The fact that the Legislature passed Public Contract Code section 10365.5, which applies only to contracts with state agencies, but failed to provide a similar law for contracts with local government entities suggests that there is no blanket prohibition against consultants contracting with local government entities for work related to their consulting services (as there clearly is in the context of state contracting under Public Contract Code section 10365.5).  But we fail to see how Public Contract Code section 10365.5 could mean that an independent contractor working for a local government entity could *never* be deemed an employee for purposes of Government Code section 1090.  In other words, the existence of Public Contract Code section 10365.5 does not suggest to us that *Hanover*, *HUB City*, *Davis*, and *McGee* were wrongly decided.

Finally, on the request of Taber, we have taken judicial notice of the legislative history of Assembly Bill No. 1059 (2013-2014), which died in the Assembly.  This bill proposed amending Government Code section 1090 to apply to "independent contractors

36

who perform a public function." It further proposed adding a new statute providing that an independent contractor employed by government agency "has a financial interest in a subsequent contract" with that agency if he or she "participates in the making of the subsequent contract." The existence of this bill does not change our analysis. As the *McGee* observed, "The legislative history provided to us does not suggest the Legislature intended to modify the statute to overrule the analysis in *Hub City*, which was decided prior to the proposed amendment." (*McGee*, *supra*, 247 Cal.App.4th at p. 250, fn. 6.)

In sum, plaintiff's allegations are sufficient to state a claim of conflict of interest. Therefore, we reverse the trial court's ruling as to plaintiff's fourth cause of action.

**E.     *Remaining Issues***

### 1.     *Sixth and Seventh Causes of Action*

Plaintiff does not challenge the trial court's ruling with respect to the sixth cause of action (improper delegation of discretion). Plaintiff's seventh cause of action was for declaratory relief. This claim is dependent upon the preceding causes of action in the FAC, all incorporated by reference, and does not allege an independent basis for relief. The trial court determined that the seventh cause of action was "superfluous, because the validity of the subject leases is an issue that is already 'fully engaged' by plaintiff's other causes of actions," citing *Hood v. Superior Court* (1995) 33 Cal.App.4th 319, 324, and *General of America Ins. Co. v. Lilly* (1968) 258 Cal.App.2d 465, 470-471. The court denied declaratory relief, citing its statutory discretion under Code of Civil Procedure section 1061. We find no reversible error in this ruling.

### 2.     *Requests for Judicial Notice*

As mentioned in footnote 1, we granted requests for judicial notice filed by plaintiff and Taber. Three additional requests for judicial notice were taken under submission. We deny the pending requests. In a motion filed November 30, 2015, plaintiff requests we take judicial notice of the first amended complaint filed in *San Bernardino*, *supra*, 239 Cal.App.4th 679, cited by defendants. This document is not necessary to resolve the standing issue raised by *San Bernardino*. (See *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6

[denying request for judicial notice where items were not necessary, helpful, or relevant].)  In a motion filed December 14, 2015, amicus curiae Association of California Construction Managers requests we take judicial notice of Assembly Bill No. 1486 (2003-2004), Assembly Bill No. 1097 (2005-2006), and a report prepared by the San Diego Taxpayers Educational Foundation.  We have already taken judicial notice of Assembly Bill No. 1486, and the Governor's veto message is described in *McGee*, *supra*, 247 Cal.App.4th at page 245.  The remaining documents are unnecessary to decide this appeal.  Finally, in a motion filed on February 4, 2016, in response to the amicus curiae briefs, plaintiff asks us to take judicial notice of 10 documents.  These materials are not necessary, helpful, or relevant to the issues presented in this appeal.

## DISPOSITION

The judgment of dismissal is reversed.  The trial court is directed to enter a new order sustaining defendants' demurrers without leave to amend as to all causes of action except the fourth cause of action for conflict of interest.  The parties shall bear their own costs on appeal.


_____

Miller, J.


We concur:


_____

Kline, P.J.


_____

Richman, J.

Filed 5/31/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| CALIFORNIA TAXPAYERS ACTION NETWORK,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>TABER CONSTRUCTION, INC., et al.,<br><br>        Defendants and Respondents. | A145078<br><br>(Contra Costa County<br>Super. Ct. No. MSC1400996)<br>ORDER CERTIFYING OPINION<br>FOR PUBLICATION |

BY THE COURT:

The opinion in the above-entitled matter filed on May 2, 2017, was not certified for publication in the Official Reports.  For good cause and pursuant to California Rules of Court, rule 8.1105, it now appears that the opinion should be published in the Official Reports, and it is so ordered.

Dated: _____          _____

Kline, P.J.

1

Trial Court:  Superior Court of Contra Costa County

Trial Judge:  Hon. George V. Spanos


| | |
|---|---|
| Attorney for Appellants | Kevin R. Carlin<br>Carlin Law Group, A.P.C. |
| Attorneys for Respondent<br>Taber Construction | Jason R. Thornton<br>Louis J. Blum<br>Finch, Thornton & Baird, LLP |
| Attorneys for Respondent<br>Mt. Diablo Unified School Dist. | Glenn N. Gould<br>Deepika S. Saluja<br>Dannis Woliver Kelley |
| Attorneys for Amicus Curiae<br>California Association of School Business<br>Officials in support of Respondents | Harold M. Freiman<br>Devon B. Lincoln<br>Travis E. Cochran<br>Lozano Smith |
| Attorneys for Amicus Curiae<br>California School Boards Association's<br>Education Legal Alliance in support of<br>Respondent Mt. Diablo Unified School Dist. | Paul G. Thompson<br>James Traber<br>Fagen Friedman & Fulfrost, LLP |
| | Keith Bray<br>Joshua R. Daniels<br>California School Boards Association/<br>Education Legal Alliance |
| Attorneys for Amicus Curiae<br>Coalition for Adequate School Housing<br>In support of Respondent<br>Mt. Diablo Unified School Dist. | Martin A. Hom<br>Jennifer D. Cantrell<br>Atkinson, Andelson, Loya, Ruud &<br>  Romo |


A145078, *California Taxpayers Action Network v. Taber Construction, Inc., et al.*

Attorney for Amicus Curiae
Association of California Construction
Managers in support of Respondent
Mt. Diablo Unified School Dist.

Martin A. Hom
Atkinson, Andelson, Loya, Ruud &
 Romo

Attorney for Amicus Curiae
Construction Employers Association
in support of Respondent
Taber Construction, Inc.

Lawrence H. Kay
Law Office of Lawrence H. Kay